

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Puerto Rico Telephone Company h/n/c Claro TV Recurridos | |
| v. | Certiorari |
| Junta de Reglamentadora de Telecomunicaciones Agencia-Recurrida | 2010 TSPR 89 179 DPR ____ |
| San Juan Cable LLC, h/n/c One Link Communications Peticionarios | |

Número del Caso: CC-2009-380

Fecha: 9 de junio de 2010

Tribunal de Apelaciones:

Región Judicial de San Juan Panel II

Jueza Ponente:      Hon. Aleida Varona Méndez

Abogados de la Parte Peticionaria:

Lcdo. Jorge Bauermeister
Lcdo. Guillermo Ramos Luiña
Lcdo. Pedro A. Delgado Hernández
Lcdo. Carlos George

Abogados de la Parte Recurrida:

Lcdo. Francisco G. Bruno
Lcdo. Frank La Fontaine
Lcda. Leslie Y. Flores Rodríguez

Junta Reglamentadora de Telecomunicaciones
Agencia Recurrida:

Lcdo. Jorge Martínez Luciano
Lcdo. José A. Rivera Ayala

Materia: Solicitud de Intervención en cuanto a Petición de Autorización para Proveer Servicio de Video (IPTV)

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Puerto Rico Telephone Company h/n/c Claro TV Recurridos | | *Certiorari* |
| v. | | |
| Junta de Reglamentadora de Telecomunicaciones Agencia-recurrida | CC-2009-380 | |
| San Juan Cable LLC, h/n/c One Link Communications Peticionarios | | |

Opinión emitida por la Jueza Asociada señora FIOL MATTA

En San Juan, Puerto Rico, a 9 de junio de 2010.

Debemos resolver si un competidor tiene derecho a intervenir en el procedimiento de evaluación de una solicitud de franquicia de cable televisión presentada por otra compañía o si, por el contrario, este derecho sólo se activa cuando se inicia un procedimiento adjudicativo para cuestionar la concesión o denegación de la franquicia o se presenta una querella. Para realizar este análisis es necesario examinar y estudiar la política pública que existe en Puerto Rico y a nivel federal sobre las telecomunicaciones del sistema de cable televisión y analizar el Capítulo V de la Ley Núm. 170 del 12 de agosto de 1988, según enmendada, conocida como la Ley de

Procedimiento Administrativo Uniforme (L.P.A.U.), que versa sobre el Procedimiento para la Concesión de Licencias, Franquicias, Permisos y Acciones Similares.[1] Además, en este mismo sentido, tenemos también que aclarar la norma que este Tribunal estableció en el caso <u>San Antonio Maritime v. Puerto Rican Cement Co.</u>[2]

Por otro lado, debemos determinar si la decisión emitida por la Junta Reglamentadora de Telecomunicaciones, relacionada con el descubrimiento de prueba y la clasificación como confidenciales de ciertos documentos, es una resolución interlocutoria y, por tanto, no puede ser objeto de revisión judicial.  A continuación se exponen los hechos pertinentes a la controversia.

## I.

El 11 de diciembre de 2008, la Puerto Rico Telephone Company (PRTC) presentó ante la Junta Reglamentadora de Telecomunicaciones una solicitud de franquicia para operar un sistema de cable TV basado en tecnología IPTV,[3] de conformidad con el Reglamento para la Expedición de Certificaciones y Franquicias[4] de la instrumentalidad.

---

[1] 3 L.P.R.A. secs. 2181-2184.

[2] 153 D.P.R. 374 (2001).

[3] Estas siglas significan Internet Protocol Television que es "una técnica para enviar programación digital a través de una red de banda ancha usando el protocolo IP (internet protocol)."  Alegato de PRTC, 21 de agosto de 2009, pág. 3, citando a Newton's Telecom Dictionary, 24th ed. 2008, págs. 514-515.

[4] Reglamento 5631, Capítulo 6, 23 de mayo de 1997.

Además, la PRTC requirió que se le diera trato confidencial a 9 de los 26 exhibits que se habían anejado a la solicitud, que el procedimiento se tramitara de forma expedita y que se le otorgara un permiso temporero para construir y operar un sistema de cable hasta que se le concediera la franquicia. El permiso temporero fue concedido por la Junta.

La Junta acogió la solicitud de PRTC el 30 de diciembre de 2008 y ordenó que se publicara la notificación sobre la solicitud de franquicia, de manera que las partes interesadas pudieran someter sus comentarios. Además, la Junta clasificó como confidencial ciertos documentos presentados por PRTC y citó para una vista pública a celebrarse los días 11 al 13 de febrero de 2009.

El 12 de enero de 2009, se publicó un anuncio notificándole al público que tenía 30 días para someter sus comentarios sobre la solicitud presentada por PRTC y que los documentos incluidos con la solicitud podrían ser revisados en la secretaría de la Junta. San Juan Cable LLC h/n/c Onelink Communications (Onelink) presentó, el 13 de enero de 2009, una moción para intervenir en el procedimiento de concesión de la franquicia solicitada por PRTC y para que se revocara la determinación de confidencialidad de los documentos, hasta tanto la agencia recibiera y evaluara sus reclamos y los del público en general.[5] En esta misma fecha, también solicitó intervención

---

[5] Hubo una petición inicial de franquicia de Coqui. Net Corporation, afiliada de PRTC, el 6 de febrero de 2008. En

en este procedimiento la compañía Liberty Cablevision of Puerto Rico, Ltd (Liberty).[6] Por su parte, la PRTC sometió una moción de reconsideración de la orden de confidencialidad para que se añadieran otros documentos, lo cual fue concedido por la Junta. Además, PRTC presentó otra moción oponiéndose a la intervención de Onelink y Liberty en el proceso de concesión de franquicia.

Ante las respectivas mociones, el 21 de enero de 2009, la Junta re-señaló la vista pública para los días 4 al 6 de marzo de 2009. Posteriormente, el 19 de febrero de 2009, le ordenó a Onelink y a Liberty venir preparadas para argumentar sobre sus respectivas solicitudes de intervención, antes de comenzar la vista, disponiendo que la PRTC tendría un término para replicar.

---

aquella ocasión, Onelink también presentó una moción de intervención, el 12 de mayo de 2008, pero la Junta declaró sin lugar la misma el 21 de mayo de 2008. No obstante, la Junta concedió un periodo para presentar comentarios, oposiciones y réplicas; señaló vista para el 26 de septiembre de 2008; y expresó que les concedería a las personas que habían sometido comentarios, incluyendo a Onelink, el derecho a comparecer a la vista y a contrainterrogar a los testigos de PRTC. (Apéndice 6, Resolución y Orden emitida por la Junta el 27 de agosto de 2008, pág. 115). Luego de que PRTC presentara sus dos testigos, la Junta desestimó sin perjuicio la petición de franquicia. La Junta señaló que ante los hechos descubiertos mediante el contrainterrogatorio de Onelink, PRTC y su afiliada habían perdido la presunción de que una petición de franquicia se presenta de buena fe; que no se hace en perjuicio de los consumidores; que no es contraria al interés público y que quien la presenta es un competidor viable. (Apéndice 8, Transcripción de vista del 10 de octubre de 2008, págs. 126-127). Mediante resolución y orden del 29 de octubre de 2008, la Junta ratificó su determinación de denegar la solicitud.

[6] Incluso, el 17 de febrero de 2009 presentó sus comentarios a la franquicia solicitada por PRTC.

El 12 de febrero de 2009, Onelink presentó una demanda sobre interdicto provisional y permanente ante la Corte de Distrito Federal en Puerto Rico alegando que el permiso provisional expedido por la Junta violaba la legislación federal y local. El Tribunal Federal dictó una orden para que la Junta mostrara causa por la que no se debía revocar el permiso provisional, por éste haberse otorgado en contravención de la sección 621 del Cable Act, 47 U.S.C.A. sec. 541 (b) (1). La Junta retiró el permiso provisional y la controversia ante el foro federal se tornó académica.

Además, el 25 de febrero de 2009, Onelink solicitó a la Junta la desestimación de la solicitud de franquicia de PRTC, alegando serias faltas de forma y sustancia. De igual forma, en esa misma fecha, presentó en el Tribunal de Primera Instancia un recurso de Mandamus solicitando que se ordenara a la Junta resolver la moción de intervención y la determinación de confidencialidad de ciertos documentos. El 2 de marzo de 2009, la Junta denegó la solicitud de intervención de Onelink y Liberty. Además, la Junta se reiteró en su determinación de que los exhibits 5 (plan de desarrollo), 17 (tabla de precios) y 20 (estados financieros) presentados por PRTC eran confidenciales, para uso exclusivo de la agencia.

Inconforme, Onelink presentó un recurso de revisión judicial y una moción en auxilio de jurisdicción ante el Tribunal de Apelaciones, el 3 de marzo de 2009. En esa misma fecha, el foro apelativo paralizó el trámite

administrativo. Luego, el 26 de marzo del 2009, se celebró una vista argumentativa en el tribunal apelativo.

Finalmente, el 31 de marzo de 2009, el Tribunal de Apelaciones confirmó la determinación de la Junta relacionada con la solicitud de intervención y se abstuvo de atender la decisión sobre la confidencialidad de los documentos. Resolvió el tribunal que carecía de jurisdicción para entender en el asunto en esta etapa de los procedimientos porque la resolución dictada por la Junta, relacionada con el descubrimiento de prueba, era interlocutoria y, además, porque después de resolver sobre el derecho a intervención era innecesario atender este asunto. En cuanto al derecho de intervención, el Tribunal de Apelaciones determinó que en los procedimientos de concesión de licencias, franquicias, permisos y acciones similares la intervención está limitada a la etapa de su impugnación y no procede en la etapa de resolver sobre su concesión. La moción de reconsideración presentada por Onelink fue denegada por el foro apelativo.

Oportunamente, Onelink presentó un recurso de certiorari y una moción en auxilio de jurisdicción ante la consideración de este Tribunal. Los errores señalados por Onelink plantean que el Tribunal de Apelaciones se equivocó: al determinar que el procedimiento adjudicativo dispuesto por la L.P.A.U. sólo existe cuando se concede o deniega una franquicia o se presenta una querella; al concluir que un competidor no tiene derecho a intervenir en el proceso de evaluación de una franquicia solicitada por

otra compañía y al encontrarse sin jurisdicción para revisar la determinación de la Junta que establece que son confidenciales tres documentos presentados por la PRTC.

PRTC y la Junta presentaron sus respectivas oposiciones a la moción en auxilio de jurisdicción. Onelink replicó a la Oposición de la Junta Reglamentadora y esta última presentó una réplica a dicha moción, mientras, PRTC sometió una Dúplica a la Moción Urgente en Auxilio de Jurisdicción.

Ordenamos entonces a la Junta, Onelink y PRTC que presentaran sus respectivos alegatos. Así lo hicieron y solicitaron que se realizara una vista oral, la cual se efectuó el 26 de octubre de 2009. Por lo tanto, con el beneficio de la comparecencia de las partes, a través de sus respectivos escritos y su argumentación oral, procedemos a resolver la controversia.

## II.

### A. Política Pública sobre Telecomunicaciones del Sistema de Cable TV

La rama ejecutiva de nuestro país ha orientado su política pública sobre telecomunicaciones, lo que incluye televisión por cable, hacia la protección de la competencia justa y efectiva entre las compañías que forman parte de este mercado. De esta forma, el gobierno se asegura que el consumidor tenga una variedad de ofertas de servicios de telecomunicaciones para que pueda seleccionar aquella que

le sea más cónsona con sus necesidades y su situación económica.

Esta política pública se concretó en la Ley Núm. 213 de 12 de septiembre de 1996, conocida como la Ley de Telecomunicaciones de Puerto Rico.[7] Basta examinar su exposición de motivos, su texto e incluso los debates legislativos para darse cuenta de esto. En su parte expositiva, se hace patente la necesidad de identificar y corregir toda **"conducta anticompetitiva"** o monopolística en el ámbito de las telecomunicaciones y, por el contrario, promover una **"competencia total, igual y leal"** para fortalecer esta industria y posibilitar el desarrollo económico de nuestro país.[8] Además, se reconoce que la industria de las telecomunicaciones tiene la finalidad de que toda la población de Puerto Rico tenga acceso a servicios de telecomunicaciones adecuados con "tarifas y cargos razonables y accesibles".[9]

Ambos objetivos también se hicieron formar parte de la declaración de política pública de esta medida. Concretamente, se entiende que la política pública sobre telecomunicaciones incluye, entre otros, lo siguiente: reconocer que el **servicio de telecomunicaciones persigue un interés público dentro de un mercado competitivo;** proveer el servicio universal a un costo justo, razonable y

---

[7] 27 L.P.R.A. sec. 265 et. seq.

[8] Énfasis nuestro. P. del S. 1500: Ley Núm. 213 de 12 de septiembre de 1996, págs. 1, 2.

[9] *Íd.*, pág. 2.

asequible para todos los ciudadanos; **asegurar un amplio número de posibilidades competitivas en la oferta de servicios** y facilidades de telecomunicaciones; **promover la competencia** y utilizar las fuerzas del mercado como factor primordial en la determinación de precios, términos, disponibilidad y condiciones de servicios; **asegurar que no existan barreras reglamentarias ni procedimientos administrativos innecesarios que entorpezcan la competencia en el mercado**; simplificar el proceso reglamentario en aquellas situaciones en que la reglamentación sea necesaria, y **dirigir la reglamentación para el bienestar del consumidor y para penalizar las prácticas anti-competitivas en el mercado de telecomunicaciones; desempeñar la función de guardián del ambiente competitivo**, permitiendo que sea este ambiente el que reglamente el comportamiento de las compañías participantes y proveer servicios de telecomunicaciones a todos los consumidores del país, incluyendo aquellos que tienen bajos ingresos o residen en áreas rurales o en áreas en que sea costoso la instalación de estos servicios.[10]

La intención de esta legislación también se percibe de las deliberaciones que tuvieron los legisladores durante el proceso de su consideración. Estas discusiones hicieron manifiesta la preocupación de proteger el interés público por encima de los intereses particulares de las empresas

---

[10] 27 L.P.R.A. sec. 265(a)(b)(f)(g)(i)(j)(p)(q).

privadas que forman parte del mercado de las telecomunicaciones. Expresiones como las del senador Rexach Benítez, el senador Marrero Padilla y el senador Hernández Agosto son un reflejo de estos principios:

> Sr. Rexach Benítez: **La apertura del mercado de las telecomunicaciones a la libre competencia** en forma alguna implica que el área de las telecomunicaciones haya dejado de ser un área de alto interés público y que las empresas que en él se desenvuelvan hayan perdido el carácter de empresas de servicio público. Esto **quiere decir que el propósito esencial de la reglamentación que la Junta Reguladora adopte es el de establecer en Puerto Rico un sistema de telecomunicaciones universal, moderno, confiable, eficiente, y a un costo asequible a las familias menos afortunadas.** A ese propósito esencial deben subordinarse los intereses particulares de las empresas privadas que compitan en el mercado de las telecomunicaciones.[11]

> Sr. Marrero Padilla: …**la competencia va a llegar a todos los recovecos del país,** a todos los sitios de la pobreza porque al competir, todo el mundo tiene que competir de igual a igual.[12]

> Sr. Hernández Agosto: **Hoy nos vemos obligados a abrir y regular el campo de la competencia y tenemos que entrar en esa competencia pensando antes que nada en el consumidor,** en que el consumidor tenga la mayor variedad de servicios, la mejor calidad de servicios al menor costo posible.[13]

La Ley de Telecomunicaciones de Puerto Rico de 1996 es el resultado de la normativa federal que el Congreso de los Estados Unidos fue aprobando para reglamentar este tipo de

---

[11] Énfasis nuestro. Diario de Sesiones del Senado de Puerto Rico, Discusión del P. del S. 1500 del 24 de junio de 1996 que se convirtió en la Ley Núm. 213 del 12 de septiembre de 1996, pág. 29780.

[12] Énfasis nuestro. *Íd.*, pág. 29786.

[13] Énfasis nuestro. *op.cit.*, pág. 29789.

servicio.[14] Primero, el Congreso aprobó la Ley de Comunicaciones (Communications Act), el 19 de junio de 1934.[15] Con esta legislación se quería proteger a los consumidores de AT&T, ya que esta compañía había adquirido un monopolio en la industria de las telecomunicaciones.[16] La idea era posibilitar que la reglamentación telefónica fuera transferida de la Comisión Interestatal de Comercio (ICC, por sus siglas en inglés) a la Comisión Federal de Comunicaciones (FCC, por sus siglas en inglés). De esta forma, el Congreso le garantizó a la FCC que tendría jurisdicción para reglamentar las comunicaciones interestatales. De igual forma, la reglamentación de materias intraestatales quedó reservada para los estados. Así se creó un sistema dual de jurisdicción federal y estatal.[17]

El contexto en que fue aprobada esta ley no consideró la comunicación por cable porque esta industria aún no se

---

[14] Caribe Comms., Inc. v. P.R.T.Co., 157 D.P.R. 203, 216 (2002); P.R.T.Co. v. J. Reg. Tel. de P. R., 151 D.P.R. 269, 278-280 (2000).

[15] 47 U.S.C.A. sec. 151 *et. seq.*

[16] Kerf and Geradin, "Controlling Market Power in Telecommunications: Antitrust vs. Sector Specific Regulation an Assessment of the United States, New Zealand and Australian Experiences", 14 Berkeley Tech. L.J. 919 (1999).

[17] 47 U.S.C.A. sec. 152(b), citado en G. J. Guzzi, "Breaking up the Local Telephone Monopolies: The Local Competition Provisions of the Telecommunications Act of 1996", 39 B.C. L. Rev. 151 (1997).

había desarrollado.[18] El auge de este tipo de comunicación surgió en los Estados Unidos a finales de los años 40 y principios de los 50 para "hacer llegar las señales de televisión a aquellas áreas donde –debido a condiciones topográficas– la recepción era dificultosa o inexistente".[19] Esto causó que el 30 de octubre de 1984, se aprobara la Ley de Comunicaciones por Cable (Cable Communicatios Policy Act) para enmendar la Ley de Comunicaciones de 1934, a los efectos de añadirle un nuevo título VI. Esta legislación tenía la finalidad de establecer una política nacional que guiara y reglamentara el desarrollo del sistema de cable TV.[20]

Otros de los propósitos de esta medida fueron: (1) establecer procedimientos y estándares de franquicias para incentivar el crecimiento y desarrollo del sistema de cable y asegurar que éste fuera responsivo a las necesidades e intereses de la comunidad local; (2) promover la competencia en la comunicación por cable y reducir la reglamentación innecesaria que causara un grave daño a la economía del sistema de cable.[21] Además, bajo esta medida se

---

[18] United States Code Congressional and Administrative News, 102nd Congress-Second Session, Vol. 4, Legislative History: Senate Report No. 102-92, P.L. 102-385, 1992, pág. 1134.

[19] G. Ariño Ortiz, J. M. de la Cuétara y L. Aguilera, Las Telecomunicaciones por Cable: Su Regulación Presente y Futura, Marcial Pons, Madrid, España, 1996, pág. 486.

[20] United States Code Congressional and Administrative News, 98th Congress-Second Session, Vol. 5, Legislative History: Senate Report No. 98-67, P.L. 98-549, pág. 4656; 47 U.S.C.A. sec. 521 (1).

[21] 47 U.S.C.A. sec. 521(2)(6); F.C.C. v. Beach Communications, 508 U.S. 307, 309 (1993).

reafirmó la competencia de los gobiernos locales para adjudicar las franquicias de televisión por cable.[22] No obstante, esta facultad concedida a los gobiernos locales no fue efectiva porque la legislación incluía otras disposiciones que la debilitaban, como la ausencia de regulación tarifaria siempre que existiera competencia efectiva, "la limitación de la cuantía de la tasa para la obtención de las [franquicias] y la escasa capacidad de los gobiernos locales para renovar las [franquicias]".[23]

Una nueva enmienda a la Ley de Comunicaciones de 1934, específicamente en su Título VI, fue aprobada por el Congreso el 5 de octubre de 1992. A ésta se le denominó Ley de Competencia y Protección del Consumidor del Servicio de Cable Televisión (Cable Television Consumer Protection and Competition Act of 1992). La medida tenía la intención de controlar el aumento excesivo en las tarifas que provocó la Ley de Comunicaciones por Cable de 1984 con su desreglamentación. A esos efectos, se optó por restablecer el derecho de las autoridades locales a reglamentar la televisión por cable con relación a las tarifas; promover la competencia en el mercado de video multicanal; proveer protección a los consumidores en contra de tarifas

---

[22] G. Ariño Ortiz, J. M. de la Cuétara y L. Aguilera, *op.cit.*, pág. 489; United States Code Congressional and Administrative News, 98th Congress-Second Session, Vol. 5, *op.cit.*

[23] G. Ariño Ortiz, J. M. de la Cuétara y L. Aguilera, *op.cit.*, pág. 489. Véase, además, United States Code Congressional and Administrative News, 102nd Congress-Second Session, Vol. 4, *op.cit.*, págs. 1134-1135.

monopolísticas y de servicios deficientes; permitir que las autoridades que ofrecen las franquicias puedan utilizar el proceso de renovación para poner en efecto estándares de servicio al cliente y proteger las necesidades e intereses de sus comunidades.[24] Además, mediante este estatuto se les prohibió a las autoridades locales conceder franquicias exclusivas y negar irrazonablemente franquicias competitivas adicionales.[25]

Finalmente, el 2 de febrero de 1996 se aprobó la Ley Federal de Telecomunicaciones (Telecommunications Act of 1996). Esta legislación también enmendó la Ley de Comunicaciones de 1934, de manera que sólo se mantuvieron vigentes aquellas disposiciones que no estuvieran en conflicto con lo pautado en la nueva ley. Su intención principal era promover la competencia y reducir la regulación para asegurar que los consumidores recibieran servicios de telecomunicaciones de calidad y a precios bajos.[26] Para esto, se le prohibió a los estados aprobar reglamentos o leyes que impidieran que una compañía proveyera servicios interestatales o intraestatales.[27] Además, se les impuso a los acarreadores el deber de

---

[24] United States Code Congressional and Administrative News, 102nd Congress-Second Session, Vol. 4, *op.cit.*, págs. 1133-1134.

[25] 47 U.S.C.A. sec. 541 a (1).

[26] R. W. Crandall & H. Furchtgott-Roth, Cable TV: Regulation or Competition, The Brookings Institution, Washington, D.C., 1996, pág. 47; G. J. Guzzi, *op.cit.*, pág. 153.

[27] 47 U.S.C.A. sec. 253a.

interconectarse, directa o indirectamente, con las facilidades y equipos de otros acarreadores y se le prohibió a éstos imponer condiciones discriminatorias o limitaciones en la reventa de sus servicios de telecomunicaciones.[28] También, la aprobación de esta legislación posibilitó que las compañías de teléfono pudieran entrar a la industria de la televisión por cable.[29]

Para implementar y administrar la política pública de la Ley de Telecomunicaciones de Puerto Rico de 1996, la Asamblea Legislativa creó a la Junta Reglamentadora de Telecomunicaciones. Ésta no es una junta meramente tarifaria sino que tiene la responsabilidad de vigilar que la competencia entre las compañías que regula se efectúe en un marco de equidad y buena fe. En otras palabras, la Junta Reglamentadora tiene la obligación de velar qué ocurre en el mercado y corregir y rectificar cualquier desviación que tengan las empresas de las normas que tienen que regir en un mercado de competencia.[30]

A este ente administrativo, la Asamblea Legislativa le delegó amplios poderes y facultades para cumplir con la encomienda de reglamentar y fiscalizar los servicios de

---

[28] 47 U.S.C.A. sec. 251 a (1) y 251 b (1). De esta forma, se elimina el monopolio que las compañías locales tenían de las franquicias. Caribe Comms., Inc. v. P.R.T.Co., *supra*, pág. 216; P.R.T.Co. v. J. Reg. Tel. de P. R., *supra*, pág. 280.

[29] United States Code Congressional and Administrative News, 104th Congress-Second Session 1996, Vol. 4, House Report No. 104-204, P.L. 104-104, págs. 11, 14-17; R. W. Crandall & H. Furchtgott-Roth, *op.cit.*; G. Ariño Ortiz, J. M. de la Cuétara y L. Aguilera, *op.cit.*, pág. 503.

telecomunicaciones en Puerto Rico.[31] Tan amplios son los poderes que tiene la Junta Reglamentadora para cumplir con la política pública de la Ley de Telecomunicaciones de Puerto Rico de 1996 que el mismo estatuto hace énfasis en que los poderes de la Junta no se limitan a los que están enumerados, sino que ésta tiene "todos los poderes adicionales implícitos e incidentales" para desempeñar los expresamente establecidos.[32] Sobre este particular, se destaca que cada una de las disposiciones de la medida, específicamente las relacionadas con las prerrogativas de la Junta Reglamentadora, tienen que ser interpretadas liberalmente para poder alcanzar los propósitos que persigue la política pública de telecomunicaciones del gobierno.[33]

En lo pertinente, la Junta Reglamentadora tiene la responsabilidad de adoptar, promulgar, enmendar o derogar aquellos reglamentos u órdenes que sean necesarios.[34] Para alcanzar esta finalidad, la Junta Reglamentadora, entre otro tipo de acciones, podrá realizar vistas públicas.[35] También, podrá exigir la información que estime necesaria,

---

[30] Diario de Sesiones del Senado, pág. 29794.

[31] P.R.T.Co. v. J. Reg. Tel. de P. R., *supra*, págs. 285-289.

[32] 27 L.P.R.A. sec. 267i.

[33] *Íd.*

[34] 27 L.P.R.A. sec. 267f(a).  Al cumplir con esta función, la Junta Reglamentadora debe seguir las disposiciones que se establecen en la Ley Núm. 170 de 12 de agosto de 1988, según enmendada, conocida como Ley de Procedimiento Administrativo Uniforme.  3 L.P.R.A. sec. 2101 *et. seq.*

[35] 27 L.P.R.A. sec. 267f(b)(8).

pero si ésta resulta ser confidencial deberá ser protegida y entregada exclusivamente al personal de la Junta, bajo cánones de no divulgación.[36]

La Junta Reglamentadora, además, tiene la facultad de conceder franquicias a las compañías que deseen "construir u operar un sistema de cable".[37] Este tipo de franquicia no es exclusiva y sólo puede concederse cuando la Junta Reglamentadora, en su ponderación, entiende que impactará positivamente el interés público.[38] El tiempo máximo por el cual se otorga una franquicia es de 18 años, aunque puede renovarse o extenderse por un máximo de 10 años adicionales si es en beneficio de los consumidores y del desarrollo económico y social del país.[39]

Toda franquicia deberá especificar, por un lado, "las condiciones, limitaciones, requisitos y áreas de servicio que [la Junta] determine son necesarias para adelantar los propósitos de [la ley]".[40] Mientras, por otro lado, también tendrá que detallar "aquellas condiciones razonables y los requisitos relativos a la ampliación y modernización de la red, calidad del servicio, extensiones y mejoras en los servicios en áreas sin servicio o pobremente servidas y evaluará las credenciales técnicas, legales, financieras y morales de los oficiales y directores de la compañía de

---

[36] 27 L.P.R.A. sec. 267f (b)(2).

[37] 27 L.P.R.A. sec. 269h (a)(1).

[38] 27 L.P.R.A. sec. 269h (a)(2).

[39] 27 L.P.R.A. sec. 269h (a)(2)(3).

cable a quien se conceda una franquicia".[41] Una vez concedida la franquicia, la Junta Reglamentadora podrá modificarla, suspenderla o cancelarla, por justa causa, si determina que la compañía de cable no ha cumplido sustancialmente con los requisitos de dicha franquicia o ha violado la ley o reglamentación aplicable, previa notificación y oportunidad de vista.[42]

Como la Ley de Telecomunicaciones de Puerto Rico de 1996 está fundamentada en la normativa federal, la Asamblea Legislativa limitó la jurisdicción de la Junta Reglamentadora a "todo aquello que no esté en conflicto con las disposiciones estatutarias y reglamentarias federales, especialmente las que corresponden a la Comisión Federal de Comunicaciones, así como aquellas normas federales que ocupen el campo".[43] Incluso, la ley establece que "[t]odas las acciones, las reglamentaciones y determinaciones de la Junta se guiarán por la Ley Federal de Comunicaciones, por el interés público y especialmente por la protección de los derechos de los consumidores".[44] Finalmente, en el caso específico de la reglamentación de sistemas de cable se menciona enfáticamente que toda reglamentación que apruebe la Junta Reglamentadora respecto a los servicios de cable deberá ser consistente con la Ley Federal de Televisión por

---

[40] 27 L.P.R.A. sec. 269h (a)(2).
[41] 27 L.P.R.A. sec. 269h(a)(3).

[42] 27 L.P.R.A. sec. 269h(a)(5).

[43] 27 L.P.R.A. sec. 267 e(a).

[44] 27 L.P.R.A. sec. 267 f(f).

Cable y el Título III de la Ley Federal de Telecomunicaciones de 1996.[45]

## B. Procedimiento Administrativo para la Concesión de Franquicia y el Derecho de Intervención

Para conferirle aplicabilidad a la política pública que establece la Ley de Telecomunicaciones de Puerto Rico de 1996, la Junta Reglamentadora ha aprobado varios reglamentos. Uno de ellos es el Reglamento para la Expedición de Certificaciones y Franquicias.[46] En lo pertinente, el propósito de este reglamento es establecer el procedimiento de otorgación de franquicias no exclusivas para construir y operar sistemas de cable en Puerto Rico.[47] Su interpretación debe hacerse para garantizar que la

---

[45] 27 L.P.R.A. sec. 269h (a)(7).

[46] Reglamento Núm. 5631 para la Expedición de Certificación y Franquicias, 23 de mayo de 2007.

[47] Reglamento Núm. 5631, *Íd.*, secs. 2.1, 4.1(c), 6.3 pág. 1, 3, 10. Una franquicia es un "permiso que se otorga a una persona o entidad para el aprovechamiento de algún servicio o bien público." I. Rivera García, Diccionario de Términos Jurídicos, Lexis Nexis, Inc., San Juan, Puerto Rico, 2000, pág. 100. Véase, además, D. Fernández Quiñones, Derecho Administrativo y Ley de Procedimiento Administrativo Uniforme, 2da Edición, FORUM, Bogotá, Colombia, 2001, pág. 28, citando a Hunt, The Export Licensing System, 398 P.L.I. Comm. 459 y a Fadden, Snyder y Sholtter, The Structure of Export Licensing, 570 P.L.I. Comm. 379. Por su parte, la Junta Reglamentadora define el concepto franquicia como:
Una autorización inicial, o la renovación de la misma (incluyendo la renovación de una autorización que ha sido otorgada sujeto a la sección 626 de la Ley de Comunicaciones, según enmendada), emitida por una autoridad que concede franquicias, sea dicha autorización designada como una franquicia, permiso, licencia, resolución, contrato, certificado, acuerdo o en cualquier otra forma, que autoriza la construcción u operación de un sistema de cable. Reglamento Núm.

concesión de la franquicia contribuya al interés público y permitir que se cumplan los objetivos de la Ley de Telecomunicaciones de Puerto Rico de 1996, los cuales son promover la competencia y proteger al consumidor.[48] Además, ésta debe realizarse en armonía con la finalidad del Reglamento para Compañías de Cable Televisión:

> …fomentar que las compañías de cable presten el mejor servicio posible de cable televisión a los residentes de Puerto Rico; fomentar el crecimiento y desarrollo de sistemas de cable que respondan a las necesidades y los intereses de la comunidad local; …y reflejar la política federal reconociendo y alentando el ambiente competitivo en que se proveen los servicios de comunicación.[49]

La Junta Reglamentadora toma en consideración dos criterios para decidir si concede una franquicia de cable tv. Éstos son: (1) que la otorgación sea en **beneficio del interés público** y posibilite el **cumplimiento con los propósitos de la Ley de Telecomunicaciones de Puerto Rico de 1996** y (2) **que la compañía que solicita la franquicia tenga las cualificaciones necesarias para contribuir al interés público.**[50]  Para determinar si se cumple con el segundo criterio, la Junta Reglamentadora evalúa:

> (i) las cualificaciones técnicas, legales, financieras y morales del solicitante, sus oficiales y directores, o socios generales, si es una sociedad.

---

5761 para Compañías de Cable Televisión, 24 de febrero de 1998, Artículo 3(M), pág. 6.

[48] Reglamento Núm. 5631, *op.cit.*, secs. 2.2, 6.3, pág. 1, 10.

[49] Reglamento Núm. 5761, *op.cit.*, pág. 3.
[50] Reglamento Núm. 5631, *op.cit.*, sec. 6.4 a (i)(ii), pág. 11.

(ii) si el otorgamiento de la solicitud es consistente con la ley y promoverá los propósitos de la Ley 213;

(iii) si el servicio será provisto de manera no discriminatoria y sin interrupciones irrazonables;

(iv) si se han establecido procedimientos adecuados para resolver disputas en cuanto al pago y la calidad del servicio, …

(v) si el solicitante ha programado, reservado y ofrecido acceso a los canales no comerciales para uso público y educacional como parte de su oferta básica de servicio, de modo que todo suscriptor tenga acceso a dichos canales; y

(vi) si la solicitud cumple con los otros requisitos de la Ley 213.[51]

Este último criterio es muy importante porque, como expone el Prof. Demetrio Fernández Quiñones, le asegura al ciudadano que la persona o corporación a la cual se le autorizó una franquicia de cable tv tiene la capacidad y las cualificaciones necesarias para realizar dicha actividad reglamentada por la Junta Reglamentadora.[52]

---

[51] Reglamento Núm. 5631, *op.cit.*, sec. 6.4 b(i)-(vi), pág. 11.

[52] D. Fernández Quiñones, *op.cit.*, pág. 28.

Las vistas públicas son una consideración procesal que puede utilizar la Junta Reglamentadora para tomar la decisión respecto a si concede una franquicia de cable tv. **Su celebración es discrecional porque está supeditada a que facilite el proceso decisional de la Junta Reglamentadora.** Además, debe realizarse conforme al Reglamento de Práctica y Procedimiento General.[53] Esto porque el mismo reglamento de franquicia establece que sus disposiciones serán suplementadas por esta normativa, **siempre que sea aplicable y consistente con la finalidad que persigue el proceso de otorgación de franquicia de cable tv.**[54]

Sobre este particular, es importante aclarar que el señalamiento de una vista pública, por sí mismo, no convierte el procedimiento de otorgación de una franquicia en adjudicativo. Tampoco lo hace la referencia al Reglamento de Práctica y Procedimiento General.[55] Al respecto, esta normativa enfatiza en que no toda solicitud de una parte obligará a la Junta Reglamentadora a señalar una vista adjudicativa, mucho menos, como en el caso de otorgar franquicias de cable tv, si es inconsistente con sus reglamentos o propósitos definidos en el estatuto que

---

[53] Reglamento Núm. 5631, *op.cit.*, sec. 6.3d, pág. 11.

[54] Reglamento Núm. 5631, *op.cit.*, sec. 3, pág. 3.

[55] Reglamento Núm. 5664 de Práctica y Procedimiento General, 5 de agosto de 1997. Este reglamento aplica a "los procedimientos de adjudicación, reglamentación, querella e investigación de ésta." Reglamento Núm. 5664, *Íd.*, sec. 2.1, pág. 1. Véase, además, la sección 1 de esta normativa donde se establece como su base legal nuestra ley de telecomunicaciones y las secciones 1.6 y 3.2 de la L.P.A.U. que aluden a los procedimientos adjudicativos.

ésta administra.[56] Para que un procedimiento sea catalogado como adjudicativo la orden emitida por la Junta debe contener lo siguiente: (1) citas del precepto legal o reglamento que autorice o requiera la vista adjudicativa; (2) en caso de querella, referencia a la disposición legal o reglamento que fue infringida; (3) una exposición de las controversias a ser tratadas en la vista; (4) la fecha, hora y lugar en que se celebrará la vista, entre otros.[57]

También, es imperativo recalcar que una vista pública no es lo mismo que una vista adjudicativa. Por eso, los procedimientos para realizar cada una de estas vistas están definidos en secciones distintas del Reglamento de Práctica y Procedimiento General. Las vistas adjudicativas se rigen por la sección 8 (Procedimientos Adjudicativos), mientras las vistas públicas funcionan de acuerdo a la sección 10 (Procedimientos de Reglamentación).[58] Sobre el ámbito de la sección 10, el reglamento establece:

> Las disposiciones de esta sección 9 [sic] aplicarán a cualquier procedimiento que la Junta (o el Secretario actuando debidamente a nombre de ésta), determine sujeto al Sub-Capítulo II de la

---

[56] Reglamento Núm. 5664, *op.cit.*, sec. 8.5(a), pág. 10.

[57] Reglamento Núm. 5664, *op.cit.*, sec. 8.5 (b)(i)-(vi), pág. 10.

[58] El ámbito de la sección 8 del Reglamento de Práctica y Procedimiento General incluye "cualquier procedimiento de naturaleza adjudicativa ante la Junta o sus delegados." Reglamento Núm. 5664, *op.cit.*, sec. 8.1, pág. 9.

> Ley 170, **o según se provea en la reglamentación de la Junta**.[59]

Tan diferente es la naturaleza de la vista pública que a éstas no le son aplicables los procedimientos adjudicativos, inclusive el derecho a contrainterrogar, a menos que la persona que preside la vista o la reglamentación de la Junta Reglamentadora disponga lo contrario.[60]

Todo el procedimiento especial para expedir franquicias debe cumplir con los parámetros establecidos en la Ley Núm. 170 de 12 de agosto de 1988, según enmendada, conocida como la Ley de Procedimiento Administrativo Uniforme (L.P.A.U.). Así lo dispone nuestra ley de telecomunicaciones cuando expone:

> Todos los procesos, para los cuales este capítulo no provea un procedimiento, serán gobernados por las secs. 2101 et. seq. del Título 3, conocidas como "Ley de Procedimiento Administrativo Uniforme de Puerto Rico". Esto quiere decir que **la Ley de Procedimiento Administrativo Uniforme de Puerto Rico gobernará los procedimientos** para la adopción de reglamentos, los procedimientos adjudicativos, la revisión judicial, **el procedimiento para la concesión de certificaciones, franquicias**, querellas de usuarios y entre compañías de telecomunicaciones, y los procedimientos para inspecciones.[61]

Esto se reafirma en el reglamento de franquicia cuando se establece que "[c]ualquier término que no esté específicamente definido en este documento, tendrá el

---

[59] Reglamento Núm. 5664, *op.cit.*, sec. 10.1, pág. 26.

[60] Reglamento Núm. 5664, *op.cit.*, sec. 10.5 (e), pág. 27.

[61] 27 L.P.R.A. sec. 271.

significado asignado al mismo en la Ley 213, la Ley 170, o en cualquier otro Reglamento promulgado por esta Junta."[62] Así también cuando se establece que la base legal para promulgar este reglamento incluye la Ley de Telecomunicaciones de Puerto Rico y la L.P.A.U.[63]

De acuerdo a la L.P.A.U., el procedimiento para expedir una franquicia, por su naturaleza, debe ser "rápido y eficiente".[64] Por esto, la Junta Reglamentadora dispuso que la decisión de otorgarla o denegarla debe tomarse en un término de 180 días, a partir de la presentación de la solicitud de franquicia.[65] La necesidad de resolver estas solicitudes con premura, es otra razón por la cual no se dispuso para su consideración un procedimiento adjudicativo. El propósito del procedimiento adjudicativo es determinar "los derechos, obligaciones o privilegios que

---

[62] Reglamento Núm. 5631, *op.cit.*, sec. 4.2, pág. 4.

[63] Reglamento Núm. 5631, *op.cit.*, sec. 1, pág. 2. Véase, además, las secciones 6.5 a, c, d y 6.6 de este mismo reglamento.

[64] 3 L.P.R.A. sec. 2181. Concretamente, el estatuto dispone que:

> Las agencias deberán establecer un procedimiento rápido y eficiente para la expedición de licencias, franquicias, permisos, endosos y cualesquiera gestiones similares… Se establece un término directivo de treinta (30) días para la expedición de las aprobaciones a que se refiere la presente sección, pudiendo las agencias establecer otros más breves o más largos, en este último caso. *Íd.*

[65] Reglamento Núm. 5631, *op.cit.*, sec. 6.5 c, pág. 12. Contrariamente, si el procedimiento fuera adjudicativo, el Reglamento de Práctica y Procedimiento General establece un término de 90 días, a partir de que se celebra la vista, para que la Junta Reglamentadora emita su decisión final. Esto en cumplimiento de la sección 3.14 de la L.P.A.U. Reglamento Núm. 5664, *op.cit.*, sec. 8.21, pág. 24.

correspondan a una parte".[66] Su naturaleza es compleja, extensa y sólo es mandatorio cuando: (1) se deniega la solicitud de franquicia sin celebrarse una vista administrativa, (2) la Junta Reglamentadora emite una orden de mostrar causa para que la parte exponga porqué no debe ser sancionada, o (3) se solicita reconsideración de una determinación de la Junta Reglamentadora, concediendo o denegando la franquicia de cable tv. Respecto a la primera posibilidad, el reglamento de franquicia dispone:

> **Siempre que la denegatoria no haya sido precedida por una vista administrativa en su fondo, el solicitante tendrá derecho a ser oído dentro de los 30 días siguientes después de la denegación total o parcial de una solicitud por parte de la Junta.** En este caso, el solicitante deberá solicitar por escrito una vista. La solicitud de vista deberá contener una declaración detallada de hechos materiales y fundamentos legales sobre los que el solicitante basa su petición. **Si la Junta determina que se ha levantado una controversia genuina respecto a un hecho pertinente en la solicitud, la Junta celebrará un procedimiento adjudicativo consistente con su Reglamento de Práctica y Procedimiento y con la [LPAU].**
>
> Si la Junta concluye, a base de su revisión del expediente, que existe una controversia de hecho pertinente planteada en la petición del solicitante, **la Junta celebrará una vista adjudicativa conforme a su Reglamento de Práctica y Procedimiento.**[67]

---

[66] Sec. 1.3 (b), 3 L.P.R.A. sec. 2102(b). Véase, además, J.P. v. Frente Unido, 165 D.P.R. 445, 461-465 (2005).

[67] Énfasis nuestro. Reglamento Núm. 5631, *op.cit.*, sec. 6.6, págs. 12-13.

Por su parte, la segunda circunstancia puede ser el resultado de una investigación de la Junta o de una querella presentada por un tercero.[68] **Además puede culminar en un señalamiento de vista si la Junta Reglamentadora determina que existe una controversia material de hecho o derecho.**[69] Incluso, si se encuentra que la parte a la cual se le emite la orden violó alguna normativa administrada por la Junta Reglamentadora, ésta le podrá imponer alguna o varias de las siguientes sanciones: (a) emitir un aviso de orientación; (b) confirmar la multa propuesta; (c) modificar la multa propuesta; (d) iniciar un proceso para modificar, suspender o revocar la franquicia.[70]

Finalmente, la tercera consideración se puede activar si una parte afectada por la decisión de la Junta Reglamentadora opta por presentar una moción de reconsideración. Sobre este particular, el reglamento de franquicias es claro al señalar que el procedimiento que se activa es el adjudicativo. Por eso, alude, específicamente, a que **las determinaciones de la Junta Reglamentadora están sujetas al procedimiento que se establece tanto en la sección 8.23 del Reglamento de Práctica y Procedimiento General y a la sección 3.15 de la L.P.A.U.**[71] **Ambas secciones**

---

[68] Reglamento 5664, *op.cit.*, sec. 11.1, pág. 28.

[69] Reglamento 5664, *op.cit.*, sec. 11.2, pág. 28.

[70] Reglamento 5664, *op.cit.*, sec. 11.3, pág. 29.

[71] Reglamento 5631, *op.cit.*, sec. 6.5 (d), pág. 12. Véase, además, Reglamento 5664, *op.cit.*, sec. 8.23 (a), pág. 25; sec. 3.15, 3 L.P.R.A. sec. 2165.

**están incluidas en los capítulos que tratan el tema de los procedimientos adjudicativos**.

Todas estas situaciones particulares están en armonía no tan solo con nuestra política pública de telecomunicaciones sino también con la establecida en el capítulo quinto de la L.P.A.U. que alude al procedimiento de concesión de franquicias. Al respecto, la L.P.A.U. claramente establece:

> **Toda persona a la que una agencia deniegue la concesión de una** licencia, **franquicia**, permiso, endoso, autorización o gestión similar **tendrá derecho a impugnar la determinación de la agencia por medio de un procedimiento adjudicativo**, según se establezca en la ley especial de que se trate y en las secs. 3.1 a 3.18 de esta ley [secs. 2151 a 2168.].[72]

Este precepto que forma parte del Capítulo V de la L.P.A.U. originalmente no se incluyó en esta medida.[73] Los

---

[72] Énfasis Nuestro. Sec. 5.4, 3 L.P.R.A. sec. 2184.

[73] Las únicas partes que componían este estatuto eran: (1) Capítulo I: Disposiciones Generales; (2) Capítulo II: Procedimientos para la Reglamentación; (3) Capítulo III: Procedimiento Adjudicativo; (4) Capítulo IV: Revisión Judicial; y (5) Capítulo V: Disposiciones Suplementarias. Historial Legislativo del P. del S. 350, Ley Núm. 170 del 12 de agosto de 1988, Informe Conjunto de la Comisión de Gobierno Estatal, la Comisión de Asuntos Municipales y la Comisión de lo Jurídico, 9 de abril de 1987, pág. 5.

El proceso de aprobación de la actual L.P.A.U. tardó, aproximadamente, 6 años y resultó en varios intentos de proyectos de ley elaborados por nuestra Asamblea Legislativa. Concretamente, en 1982 se desarrolló el P. del S. 679, P. de la C. 438, el P. de la C. 439 y el P. de la C. 440.

En el P. del S. 679 de 21 de septiembre de 1982 de la Ley de Procedimiento Administrativo para el Estado Libre Asociado de Puerto Rico, conocida hoy como la L.P.A.U., la estructura estaba dividida en las siguientes partes: Artículo I: Disposiciones Generales; Artículo II: Acceso del Público a la Agencia; Artículo III: Reglamentación;

procedimientos para la concesión de franquicias fueron

incluidos en un capítulo separado a través de la enmienda

---

Artículo IV: Procedimientos Adjudicativos; Artículo V: Revisión Judicial y Cumplimiento Civil. Cada uno de estos artículos estaba igualmente subdividido por capítulos. Historial Legislativo del P. del S. 679 de 1982, P. del C. 438, 439 y 440 de 1982.

Tanto en el P. del C. 438 (Ley de Reglas, Reglamentos y Decisiones Administrativas de Puerto Rico) como en el 439 (Ley Uniforme para la Concesión de Licencias de Profesiones, Oficiones u Ocupaciones del Estado Libre Asociado de Puerto Rico) y 440 (Ley de Procedimiento Administrativo), todos del 10 de marzo de 1982, la Ley no estaba estructurada por artículos, capítulos y secciones con sus respectivos títulos y subtítulos. Sólo estaba dividida en números consecutivos de artículos o secciones con sus respectivos títulos. En cada uno de estos proyectos, excepto en el P. del C. 438, como en el P. del S. 679, se hacía referencia a las licencias en la parte de definiciones como en el texto en general. Por ejemplo, en el P. del S. 679 se definía el término licencia como "cualquier permiso, certificado, aprobación, privilegio, franquicia, certificación, patente, autorización o cualquier otra forma similar de permiso requerido por ley". Además, en el texto del estatuto se ubicaba como parte del Artículo IV: Procedimientos Adjudicativos, Capítulo I: Disponibilidad, Sección 4-103: Decisión de no Conducir un Procedimiento Adjudicativo, Sección 4-104: La Acción sobre Solicitudes y la Sección 4-105: Acción Contra Poseedores de Licencias. La concesión de la licencia podía o no convertirse en un proceso adjudicativo. Esta determinación era discreción de la agencia. Lo que sí era claramente un proceso adjudicativo era la acción de la agencia para revocar, suspender, modificar, anular, retirar o enmendar una licencia y el proceso de reconsideración. Historial Legislativo del P. del S. 679, págs. 4, 27-29, 47. En el caso del P. del C. 439 también se incluye como proceso adjudicativo la renovación, enmienda, modificación o anulación de la licencia y la reconsideración de la determinación de la agencia. Historial Legislativo P. de la C. 439, pág. 24, 31. Igual consideración está presente en el P. de la C. 440. Historial Legislativo del P. de la C. 440, pág. 23, 27.

que la Comisión de lo Jurídico Civil realizó en el Informe del Sustitutivo al P. del S. 350.[74] Hoy día el estatuto, además de mantener el Capítulo V sobre Procedimiento para la Concesión de Licencias, Franquicias o Permisos, incorpora el Capítulo VI denominado Fiscalización e Inspección y Gestiones Conjuntas y el Capítulo VII sobre Penalidades Administrativas.[75] La concepción de cada uno de estos capítulos se basó en los procedimientos uniformes mínimos que se relacionaban con las distintas funciones que realizan las agencias. En concreto, **"su fórmula legislativa está concebida en función de los procedimientos administrativos incluidos y toma en consideración las características individuales de cada uno de éstos"**.[76]

En un comentario a la sección 5.4 del Capítulo V antes mencionada, el Hon. Ángel G. Hermida, Juez del Tribunal Superior, plantea lo siguiente:

> **El Capítulo V supone que el procedimiento original para la concesión o denegación de estas autorizaciones es distinto del procedimiento adjudicativo reglamentado por el Capítulo III;** y la sección 5.4 de la ley dispone que en casos en que se deniegue la autorización interesada, la parte afectada por dicha denegatoria tendrá derecho a impugnarla "por medio de un procedimiento adjudicativo, según se establezca en la ley especial de que se trate y en el capítulo III de esta ley".[77]

---

[74] Historial Legislativo del P. del S. 350, Ley Núm. 170 del 12 de agosto de 1988, Informe del Sustitutivo al P. del S. 350, 3 de junio de 1988, pág. 37.

[75] 3 L.P.R.A. sec. 2101 et. seq.  Se eliminó un capítulo sobre disposiciones suplementarias.

[76] Énfasis nuestro.  Pagán Ramos v. F.S.E., 129 D.P.R. 888, 901 (1992).

[77] Énfasis nuestro. Hon. Ángel G. Hermida, Juez del Tribunal Superior, "La Ley de Procedimiento Administrativo Uniforme

Este Tribunal tuvo la oportunidad de interpretar la sección 5.4 de la L.P.A.U. en el caso <u>San Antonio Maritime v. Puerto Rican Cement Co.</u>[78] En este caso, la Junta de Calidad Ambiental (JCA) le expidió a San Antonio Maritime, Transcaribbean Maritime y Antilles Cement un permiso temporero para la operación de una fuente de emisión, condicionado a que San Antonio continuara y concluyera los trámites administrativos que simultáneamente se realizaban en la Administración de Reglamentos y Permisos (ARPE), relativos a la autorización para la construcción y uso de un silo para el despacho de cemento. Por su parte, la Puerto Rican Cement Company (PRCC) presentó ante la JCA una solicitud de intervención, reconsideración y revocación de ese permiso. A causa de esta solicitud, la JCA expidió una orden de mostrar causa por la cual no se debía revocar el permiso temporero.

Se celebró una vista y luego de escuchar los argumentos de PRCC, de la JCA y de San Antonio Maritime, el oficial examinador denegó la solicitud de intervención de PRCC. Luego de esto, se continuaron los procedimientos ante el oficial examinador sobre los méritos de la controversia. Cuando se inició nuevamente la vista para mostrar causa, San Antonio solicitó el archivo del procedimiento porque

---

de 1988 y las Reglas para la Revisión Judicial de 1989: Algunos Aspectos de Especial Interés para los Jueces", Revista FORUM, 2 de mayo de 1989, pág. 21, dentro del Historial Legislativo del P. del S. 350, Ley Núm. 170 del 12 de agosto de 1988.

[78] *Supra.*

entendía que la concesión del permiso permanente tornaba en académicos todos los procesos relativos al permiso temporero. Así lo recomendó el oficial examinador, aprobándolo la JCA.

PRCC recurrió ante el TA mediante recurso de revisión administrativa cuestionando las decisiones de la JCA (1) aceptando la DIA-N de ARPE, (2) expidiendo permiso condicionado, (3) expidiendo permiso de operación permanente, (4) aceptando las recomendaciones del oficial examinador de denegar la intervención y decretar la academicidad del caso.

ARPE, por su parte, autorizó el anteproyecto para la instalación de un silo y PRCC apeló esta determinación ante la Junta de Apelaciones sobre Construcción y Lotificaciones (JACL). Alegó PRCC que la ARPE había errado al autorizar un anteproyecto de construcción sin antes permitir la intervención solicitada. La JACL desestimó la apelación de PRCC por falta de legitimación activa. Por esto, PRCC acudió al Tribunal de Apelaciones planteando que JACL erró al establecer que no tenía legitimación. El foro apelativo revocó las resoluciones recurridas y ordenó el reinicio de los procedimientos adjudicativos para permitir la intervención de PRCC en los foros administrativos.

Concentramos la controversia de este caso en si PRCC tenía derecho a intervenir en el proceso adjudicativo de la orden de mostrar causa por la cual no debía revocarse el permiso temporero de emisión, concedido por la JCA a San Antonio Maritime, y en el proceso de impugnación de

concesión de los permisos permanentes para construcción y uso del silo, otorgados por ARPE y confirmados por la JACL. Al analizar la controversia, concluimos que existe una estrecha relación entre el proceso adjudicativo y el de concesión de licencia o permiso, una vez la agencia encargada otorga o deniega esta autorización. Ante tal realidad y el hecho de que la finalidad del proceso de concesión de licencia, permiso o franquicia es proteger el interés público, extendimos el derecho de intervención al proceso de impugnación de la determinación de la agencia a cualquier persona afectada por ésta. Dentro de esos parámetros fue que expresamos lo siguiente:

> Además, es indiscutible el hecho de que **el requerimiento de una demostración de causa por la cual no debían revocarse los permisos, luego de haberse otorgado los mismos, con la posibilidad intimada de decretar la revocación de dichos permisos, realmente es una iniciativa que da lugar a un proceso adjudicativo, ya sea teniendo como parte actora o promovente a la agencia o a PRCC.** Es un proceso en el cual ha de adjudicarse si San Antonio tiene o no derecho a retener la eficacia de los permisos concedidos por la Junta de Calidad Ambiental para la construcción y operación de una fuente de emisión. **Claramente estamos ante un proceso adjudicativo.** Procede, por lo tanto, **aplicar a dicho proceso las reglas relativas a la solicitud de intervención contenidas en la L.P.A.U. y en los reglamentos administrativos sobre procesos adjudicativos** de las agencias concernidas en el asunto.[79]
>
> …
>
> Por otro lado, y en lo referente a la solicitud de intervención de PRCC ante ARPE y JACL, **en apelación de la determinación de ARPE de conceder los permisos permanentes de construcción y uso solicitados por SAM,**

---

[79] San Antonio Maritime v. Puerto Rican Cement Co., *supra*, pág. 390.

somos del criterio que, bajo el razonamiento antes expuesto, **claramente se erró al no concederlas.**[80]

Más recientemente, en <u>Ranger American of PR v. Loomis Fargo</u> expresamos claramente que el procedimiento adjudicativo que surge luego de que la agencia determina otorgar o denegar una licencia, permiso o franquicia, está disponible tanto para los solicitantes a quienes se les denegó dicha autorización como a terceros que interesen impugnar lo concedido por la agencia.[81]

Al activarse este proceso adjudicativo, una persona que no fue considerada originalmente como parte por la Junta Reglamentadora puede presentar una solicitud de intervención, hasta 15 días antes de celebrarse la vista.[82] Esta petición deberá realizarse por escrito, estar debidamente fundamentada y demostrar la capacidad e interés legítimo y sustancial que la persona tiene en el procedimiento.[83] Además, para considerar la moción de

---

[80] <u>San Antonio Maritime v. Puerto Rican Cement Co.</u>, *supra*, pág. 398.

[81] <u>Ranger American of PR v. Loomis Fargo</u>, 171 D.P.R. 670, 680-681 (2007). Ese tercero pudiera ser un competidor, según resolvimos en <u>San Antonio Maritime v. Puerto Rican Cement Co.</u>, *supra*, págs. 394-395, siempre que se establezca que tiene un interés legítimo y sustancial en la controversia. <u>Fund. Surfrider y Otros v. A.R.P.E.</u>, 2010 T.S.P.R. 37; <u>Junta de Planificación v. Cordero Badillo</u>, 2009 T.S.P.R. 160; <u>San Antonio Maritime v. Puerto Rican Cement Co.</u>, *supra*, págs. 391-395.

[82] Reglamento 5664, *op.cit.*, sec. 8.7, pág. 11. Véase, además, <u>Asoc. Residentes v. Montebello Dev. Corp.</u>, 138 D.P.R. 412, 420 (1995).

[83] 3 L.P.R.A. sec. 2102(e), 2155. Véase, además, <u>Fund. Surfrider y Otros v. A.R.P.E.</u>, *supra*; <u>Junta de Planificación v. Cordero Badillo</u>, *supra*; <u>Com. Ciudadanos Caimito v. G.P. Real Prop.</u>, 2008 T.S.P.R. 105.

intervención, ésta deberá incluir prueba de los criterios

establecidos en la sección 3.5 de la L.P.A.U.  Al respecto,

el Reglamento de Práctica y Procedimiento dispone que se

debe proveer prueba de que:

> (a)  Los intereses del peticionario pueden afectarse adversamente por el procedimiento adjudicativo;
>
> (b)  (i) el peticionario no tiene ningún otro medio legal para proteger adecuadamente su interés;
>
> (ii) los intereses del peticionario no están adecuadamente representados por otras partes en el procedimiento;
>
> (iii) la participación del peticionario puede ayudar a desarrollar un expediente más completo;
>
> (iv) el peticionario representa o es portavoz de otros grupos o entidades en la comunidad;
>
> (v) el peticionario puede contribuir con información, peritaje, conocimiento especializado o asesoramiento técnico que no estarían disponibles de otra manera en el procedimiento; y
>
> (c)  La participación del peticionario no extenderá ni dilatará innecesariamente los procedimientos.[84]

La decisión de conceder o denegar una petición de

intervención es el resultado de la discreción de la Junta

Reglamentadora al ponderar cada uno de los criterios que

establece la L.P.A.U.[85] Si se concede la intervención, el

peticionario se convierte en parte del proceso, mientras,

si se deniega se le notificará una orden con las razones

---

[84] Reglamento 5664, *op.cit.*, sec. 8.7, pág. 11; 3 L.P.R.A. sec. 2155.

[85] Reglamento 5664, *op.cit.*, sec. 8.8 (a), pág. 12.

que justifican la determinación de la Junta Reglamentadora.[86]

Como es evidente, el derecho de intervención sólo puede existir dentro de un procedimiento adjudicativo. Si no existe este tipo de proceso, este derecho es inexistente. Este Tribunal sólo se ha expresado a los efectos de establecer que efectivamente existe un procedimiento adjudicativo cuando la entidad reguladora, en este caso la Junta Reglamentadora, decide conceder o denegar la franquicia, licencia o permiso y se cuestiona o impugna esa decisión. Nunca antes nos hemos expresado sobre si la naturaleza del procedimiento adjudicativo, y, por ende, el derecho de intervención, está presente también en el momento inicial en que se dilucida si se concede o no la licencia o franquicia solicitada. Para analizar esta controversia, es necesario auscultar la intención legislativa.

Hemos validado constantemente la interpretación que tiene como finalidad identificar los propósitos que persigue una ley, de forma tal que ésta se ajuste a la política pública que la inspira.[87] Para realizar ese

---

[86] Reglamento 5664, *op.cit.*, sec. 8.8 (b) (c), pág. 12. Véase, además, 3 L.P.R.A. sec. 2102 (j) donde se define parte como "toda persona o agencia autorizada por ley a quien se dirija específicamente la acción de una agencia o que sea parte en dicha acción, o que se le permita intervenir o participar de la misma, o que haya radicado una petición para la revisión o cumplimiento de una orden, o que sea designada como parte en dicho procedimiento".

[87] Orsini García v. Secretario de Hacienda, 2009 T.S.P.R. 190; Corp. Difusión Pública v. C.E.E., 2007 T.S.P.R. 231; Irizarry v. J & J Cons. Prods. Co., Inc., 150 D.P.R. 155,

ejercicio de interpretación estatutaria, debemos, en primera instancia, examinar el texto de la ley porque "es la expresión por excelencia de toda intención legislativa", siempre que el legislador se haya expresado en "lenguaje claro e inequívoco".[88] En este proceso de búsqueda de la intención legislativa, también es conveniente auscultar y analizar el historial legislativo de la medida que incluye los informes sometidos por las comisiones de Cámara y el Senado y el diario de sesiones.[89] También, como parte de ese proceso, hemos expresado, enfáticamente, que "las leyes hay que interpretarlas y aplicarlas en comunión con el propósito social que las inspira, sin desvincularlas de la realidad y del problema humano que persiguen resolver".[90] Además, según explica Ihering, "el fin es el creador de

---

163 (2000); Piñero v. A.A.A., 146 D.P.R. 890, 898 (1998); Dorante v. Wrangler, 145 D.P.R. 408, 417 (1998); Col. Ópticos P.R. v. Pearl Vision Center, 142 D.P.R. 221, 228 (1997); J.R.T. v. A.E.E., 133 D.P.R. 1, 9 (1993); Zambrana Maldonado v. E.L.A., 129 D.P.R. 740, 749 (1992); Vázquez v. A.R.P.E., 128 D.P.R. 513, 523 (1991); García Pagán v. Shiley Caribbean, et al., 122 D.P.R. 193, 208 (1988). Véase, además, R.E. Bernier y J.A. Cuevas Segarra, Aprobación e Interpretación de Leyes en Puerto Rico, Segunda Edición Revisada, Publicaciones J.T.S., 1987, Vol. 1, págs. 245-246.

[88] Romero Barceló v. E.L.A., 169 D.P.R. 460, 476-477 (2006). Véase, además, Ortiz v. Municipio de San Juan, 167 D.P.R. 609, 617 (2006); Departamento de Hacienda v. Telefónica, 164 D.P.R. 195, 215 (2005).

[89] Ortiz v. Municipio de San Juan, 167 D.P.R. 609, 617 (2006).

[90] Orsini García v. Secretario de Hacienda, supra; Matos v. Junta Examinadora, 165 D.P.R. 741, 748 (2005); Piñero v. A.A.A., Íd; Col. Ópticos P.R. v. Pearl Vision Center, Íd; Col. Ing. Agrim. P.R. v. A.A.A., 131 D.P.R. 735, 756 (1992); Vázquez v. A.R.P.E., Íd; García Pagán v. Shiley Caribbean, Etc., Íd.

todo [d]erecho" y "no hay norma jurídica que no deba su origen a un fin, a un propósito, esto es, a un motivo práctico."[91]

Hemos realizado un análisis integrado de nuestra ley de telecomunicaciones, su historial legislativo, la reglamentación aplicable de la Junta Reglamentadora y la legislación federal sobre telecomunicaciones, la L.P.A.U. y su historial legislativo. Tanto la política pública de nuestra legislación sobre telecomunicaciones como la federal tienen la finalidad de proteger al consumidor, posibilitando una competencia que viabilice mejores servicios de cable tv y menores costos. Atado a esto se encuentra el interés de la Asamblea Legislativa de que los procesos de concesión de franquicia o permisos sean rápidos y eficientes. Por esto, se optó por estructurar de forma separada cada uno de los servicios que ofrecen las agencias, entre ellos se definió un capítulo para los procedimientos adjudicativos y otro para los procesos de concesión de franquicia, licencia o permiso. En ese sentido, sólo se permitió la integración de ambos procesos mediante la sección 5.4 de la L.P.A.U., es decir, para impugnar la determinación de la agencia.

---

[91] Citado en L. Recasens Siches, Nueva Filosofía de la Interpretación del Derecho, 2da Edición, Editorial Porrúa, México, 1973, pág. 41; Véase, también, E. Pedro Haba, El Espejismo de la Interpretación Literal: Encrucijadas del Lenguaje Jurídico, Tomo I, 1era Edición, San José, C. R.: Corte Suprema de Justicia, Escuela Judicial, 2003, págs. 69-70.

Ante estas circunstancias, tenemos que concluir que el proceso inicial de concesión de licencia o franquicia no es adjudicativo y, por lo tanto, en esa etapa es inaplicable el derecho de intervención. Esta determinación no se altera por el hecho de que existan leyes especiales reguladas por las agencias que permitan una mayor participación, incluso específica y definida, de personas que se opongan a la solicitud de franquicia o permiso. Aunque tal consideración podría hacer parecer que este proceso es adjudicativo, no lo es porque no se está cuestionando la decisión de una agencia ni se está contraponiendo un derecho sobre otro. La participación de estas personas sólo es un mecanismo para obtener información que le pueda ser útil a la agencia para tomar la determinación de conceder o denegar una licencia, permiso o franquicia. Llegar a una conclusión diferente derrotaría nuestra política pública sobre las telecomunicaciones y los propósitos del Capítulo V de la L.P.A.U.

**C. Orden o Resolución sobre Confidencialidad de Documentos**

La L.P.A.U. define el término orden o resolución como "cualquier decisión o acción agencial de aplicación particular que adjudique derechos u obligaciones de una o más personas específicas, o que imponga penalidades o sanciones administrativas excluyendo órdenes ejecutivas emitidas por el Gobernador".[92] Este tipo de determinación

---

[92] Sec. 1.3 (f), 3 L.P.R.A. sec. 2102 (f).

puede ser emitida por la agencia administrativa con carácter final, parcial o interlocutorio. Es importante establecer el tipo de orden o resolución porque esto definirá si puede ser revisada judicialmente. En otras palabras, permitirá determinar si el Tribunal de Apelaciones y, por ende, este foro tienen jurisdicción para entender en la controversia.

Una orden o resolución es parcial cuando la acción de la agencia, adjudicando derechos y obligaciones de las partes, sólo atiende un aspecto de la controversia y no su totalidad.[93] Por su parte, se entiende que una orden es interlocutoria si la actuación de la entidad gubernamental sólo resuelve un asunto exclusivamente procesal. Aunque la L.P.A.U. no ha definido el concepto "orden o resolución final", reiteradamente hemos establecido que "se refiere a las decisiones que ponen fin al caso ante la agencia y que tienen efectos sustanciales sobre las partes".[94]

De todas estas modalidades de órdenes o resolución, sólo la que culmina el procedimiento administrativo puede ser objeto de revisión judicial. Sobre el particular la L.P.A.U. dispone:

> Una parte adversamente afectada por una orden o resolución final de una agencia y que haya agotado todos los remedios provistos por la agencia o por el organismo administrativo apelativo correspondiente podrá presentar una

---

[93] Sec. 1.3 (g), 3 L.P.R.A. sec. 2102 (g).

[94] J. Exam. de Tec. Méd. v. Elías et. al., 144 D.P.R. 483, 490 (1997). Véase, además, Depto. Educ. v. Sindicato Puertorriqueño, 168 D.P.R. 527, 545 (2006).

solicitud de revisión ante el Tribunal de Apelaciones…

Una orden o resolución interlocutoria de una agencia, incluyendo aquéllas que se emitan en procesos que se desarrollen por etapas, no serán revisables directamente. La disposición interlocutoria de la agencia podrá ser objeto de un señalamiento de error en el recurso de revisión de la orden o resolución final de la agencia.[95]

La idea de limitar el ámbito de revisión judicial a las órdenes finales de las agencias fue evitar que el trámite administrativo fuera interrumpido injustificadamente.[96] Como es interlocutoria la resolución que dictó la Junta Reglamentadora sobre el descubrimiento de prueba y la clasificación como confidenciales del plan de desarrollo, la tabla de precios y los estados financieros de PRTC, no tenemos jurisdicción para atenderla en esta etapa de los procedimientos.[97]

**III.**

La compañía PRTC solicitó ante la Junta Reglamentadora la aprobación de una franquicia para operar un sistema de

---

[95] Sec. 4.2, 3 L.P.R.A. sec. 2172.(Suplemento Acumulativo, 2009).

[96] J. Exam. de Tec. Méd. v. Elías et. al., *supra*, pág. 490, citando el Historial Legislativo del P. del S. 350, Informe Conjunto de la Comisión de Gobierno Estatal, Asuntos Municipales y de lo Jurídico, 10 de abril de 1988.

[97] Sobre este particular, el Reglamento 5761 para Compañías de Cable Televisión dispone que:

Todo plan de desarrollo de servicio sometido por las compañías ante la Junta se mantendrá confidencial y no se divulgará o revelará a tercero alguno. Artículo 12(D), pág. 27. Véase, además, 27 L.P.R.A. sec. 267 f(b)(2).

cable tv. Por su parte, Onelink peticionó que se le autorizara intervenir en este proceso inicial de evaluación de la solicitud de PRTC. Fundamentó su derecho de intervención en que el proceso de concesión de franquicia era adjudicativo, que tenía un interés propietario que podía verse afectado y que su intervención permitiría proteger su derecho a una competencia justa. Además, Onelink argumenta que el señalamiento de una vista pública por la Junta Reglamentadora convirtió el procedimiento de concesión de franquicia en adjudicativo. No coincidimos con ninguno de los planteamientos de Onelink. Veamos.

Primero, nuestra política pública sobre telecomunicaciones, que se fundamenta en la legislación federal, está dirigida a proteger al consumidor y promover la competencia. La idea es eliminar el monopolio que originalmente existía en el negocio de cable tv, de manera que la ciudadanía pueda tener mayores y mejores ofertas de servicios a un costo razonable. Por esto, el mismo estatuto de telecomunicaciones y la reglamentación de franquicia claramente prohíben que la Junta Reglamentadora otorgue franquicias exclusivas. La franquicia de cable TV de Onelink no es la excepción a esta norma. Ésta constituye en sí misma el interés propietario que tiene Onelink porque establece sus derechos y prerrogativas. Concretamente, la Cláusula 2 (9) del Contrato de Franquicia de Onelink dispone:

> **The Board desires competition in cable services in the Municipalities and believes competition will benefit the residents of the Municipalities.**

> Further, the Board believes that competition can develop without substantial injury to Franchisee or Franchisee's ability to perform its promises in this Agreement. The Franchisee has entered this Agreement with a full understanding that the **Board intends to encourage the development of a fair competition.**[98]

Como puede observarse, la franquicia de Onelink claramente promueve la competencia, por lo cual la concesión de una franquicia a PRTC no afecta su interés propietario. Es decir, el hecho de que se le conceda una franquicia de cable tv a PRTC no hace que Onelink pierda la suya. Ambas franquicias son independientes. Lo único que provoca la concesión de la franquicia a PRTC es cumplir con la política pública que establece nuestra ley de telecomunicaciones.

Por otro lado, no se puede impulsar la competencia justa o injusta si no se permite la interacción entre competidores. Esta obviamente no se da en el contexto del proceso de concesión de franquicia, sino luego de que la Junta Reglamentadora determina otorgar la autorización. Además, la Junta Reglamentadora es la entidad responsable de regular y asegurarse de que existe una competencia leal. Actualmente, Onelink es el único proveedor de servicios de cable tv en el área metropolitana y en los pueblos de Toa Alta y Toa Baja. Esto sin incluir a los residenciales públicos, a los cuales Onelink no le brinda servicios.

---

[98] Énfasis nuestro. Apéndice 58, "Franchise Agreement Between The Telecommunications Regulatory Board of Puerto Rico and San Juan Cable, LLC For Franchise FC-23, págs. 813-814.

Segundo, la naturaleza de los procesos adjudicativos es diferente a la de los procedimientos de concesión de franquicia o permisos. Así lo estableció la Asamblea Legislativa cuando expresó su interés de que los procesos de franquicias se realizaran de forma rápida y eficiente. Por el contrario, los adjudicativos tienden a ser complejos y extensos. Precisamente, esa diversidad fue lo que promovió que cada una de las funciones realizadas por las agencias se estructurara en capítulos diferentes dentro de la L.P.A.U.

Otro elemento que valida el hecho de que el proceso de concesión de franquicia no es adjudicativo es la sección 5.4 de la L.P.A.U. A través de este precepto es que se activa el proceso adjudicativo, una vez la Junta Reglamentadora tome la determinación de denegar o conceder la franquicia de cable tv a PRTC. En este momento es que Onelink, PRTC o cualquier parte con capacidad e interés legítimo y sustancial podría solicitar intervenir. Específicamente, Onelink podría impugnar la concesión de franquicia a PRTC por violar las leyes y reglamentos de la Junta Reglamentadora o promover una competencia desleal. Antes de este momento, la intervención de Onelink no tan solo dilataría los procedimientos de concesión de franquicia, sino que desvirtuaría la política pública de telecomunicaciones y de la L.P.A.U.

Esta determinación no se altera, como trata de argumentar Onelink, con la decisión de la Junta de celebrar una vista pública para escuchar la posición de aquellas

partes interesadas en el proceso. Una vista pública no es una vista adjudicativa. Es sólo un mecanismo que le permite a la Junta Reglamentadora tomar la determinación de conceder o denegarle la franquicia de cable tv a PRTC de una manera más informada. Esta es una actuación prudente y sensata de la Junta, como lo fue su decisión de permitir que Onelink sometiera comentarios extensos a la petición de franquicia de PRTC.[99]

Recordemos que una agencia no ejerce una función adjudicativa por el mero hecho de evaluar si concede o deniega una franquicia o permiso. En ese proceso no se están determinando derechos u obligaciones del solicitante, tomando en consideración hechos específicos y confrontándolos con las normas existentes, como sucede en un procedimiento adjudicativo. En el caso específico de la compañía PRTC, lo único que la Junta Reglamentadora está realizando es una ponderación para determinar si el conceder la franquicia de cable tv a PRTC puede contribuir a promover la competencia y proteger al consumidor. Este proceso evaluativo no tiene nada que ver con los procesos adjudicativos.

## IV.

Por los fundamentos antes expresados, se confirma la sentencia emitida por el Tribunal de Apelaciones denegando la solicitud de intervención de Onelink al procedimiento de

---

[99] Transcripción de la Vista ante el Tribunal Supremo, 26 de octubre de 2009, pág. 32.

concesión de franquicia de cable tv peticionada por la PRTC y se devuelve el caso a la Junta Reglamentadora para la continuación de los procedimientos.

Se dictará sentencia de conformidad.


                                        Liana Fiol Matta
                                        Jueza Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Puerto Rico Telephone Company h/n/c Claro TV<br>Recurridos<br><br>v.<br><br>Junta de Reglamentadora de Telecomunicaciones<br>Agencia-recurrida<br><br>San Juan Cable LLC, h/n/c One Link Communications<br>Peticionarios | CC-2009-380 | *Certiorari* |

*SENTENCIA*

En San Juan, Puerto Rico, a 9 de junio de 2010.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte integrante de la presente Sentencia, se confirma la sentencia emitida por el Tribunal de Apelaciones denegando la solicitud de intervención de Onelink al procedimiento de concesión de franquicia de cable tv peticionada por la PRTC y se devuelve el caso a la Junta Reglamentadora para la continuación de los procedimientos.

Lo acordó y manda el Tribunal y certifica la Secretaria del Tribunal. El Juez Asociado señor Rivera Pérez no intervino. La Jueza Asociada señora Rodríguez Rodríguez inhibida. La Jueza Asociada señora Pabón Charneco concurre con el resultado sin opinión escrita.


Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo