EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| Municipio Autónomo de San Sebastián, et al<br><br>Peticionarios<br><br>v.<br><br>QMC Telecom, LLC; Oficina de Gerencia de Permisos y otros<br><br>Recurridos | Certiorari<br><br>2014 TSPR 45<br><br>190 DPR \_\_\_\_ |

Número del Caso: CC-2012-233


Fecha: 24 de marzo de 2014


Foro de Procedencia:

      Junta Revisora de Permisos y Uso de Terrenos

Abogados de la Parte Peticionaria:

      Lcdo. Pedro Saadé Lloréns
      Lcdo. Omar Saadé Yordan


Abogados de la Recurrida:

      Lcdo. Miguel Rodríguez Marxuach
      QMC Telecom

      Lcda. Margarita Mercado Echegaray
      Oficina de Gerencia y Permisos


*Amicus Curiae*:

      Lcdo. Jaime Toro Monserrate


Materia: Ley 161-2009, Ley sobre la Construcción Instalación y Ubicación de Torres de Telecomunicaciones en Puerto Rico. Definición del término "residencia" foro con jurisdicción para revisar las decisiones de la Junta Revisora de Permisos y uso de terrenos.


Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Municipio Autónomo de San Sebastián, et al<br><br>Peticionarios<br><br>v.<br><br>QMC Telecom, LLC; Oficina de Gerencia de Permisos y otros<br><br>Recurridos | CC-2012-233 | |

Opinión del Tribunal emitida por el Juez Presidente señor HERNÁNDEZ DENTON.

En San Juan, Puerto Rico, a 24 de marzo de 2014.

Este recurso nos brinda la oportunidad, por un lado, de aclarar el alcance del Art. 13.1 de la Ley Núm. 161-2009, *infra*, a la luz de nuestras expresiones en Cordero v. OPGPe, 187 D.P.R. 445 (2012), y por otro, de interpretar el término "residencia" establecido en la Ley sobre la Construcción, Instalación y Ubicación de Torres de Telecomunicaciones de Puerto Rico, Ley Núm. 89-2000, 27 L.P.R.A. sec. 321 *et seq.*, (Ley Núm. 89-2000). Por los fundamentos expuestos a continuación, revocamos la determinación de la Junta Revisora de Permisos y Uso de Terrenos (Junta Revisora).

I.

El 16 de marzo de 2010, QMC Telecom,LLC(QMC) solicito un permiso de construcción de torre de

telecomunicación ante la Administración de Reglamentos y Permisos (ARPe). La facilidad de telecomunicaciones se construiría en el Barrio Altosano del Municipio Autónomo de San Sebastián (Municipio). El 23 de marzo de 2010, una vez atendida la solicitud, la ARPe notificó una "Notificación de Aprobación de Permiso de Construcción Certificado". En dicha misiva, se requirió el cumplimiento con ciertas condiciones para la expedición final del permiso, entre ellas, que el Municipio endosara el proyecto.

En julio de 2010, QMC presentó la evidencia requerida. Con relación al Municipio, sometió dos cartas. En una, el Municipio expresaba su endoso al proyecto, condicionado a que se cumplieran con todas las exigencias impuestas por la agencia y a que los vecinos no se opusieran. En la otra, de fecha posterior, el Municipio retiró su endoso a la construcción, porque los vecinos cercanos se opusieron al referido proyecto. Ante ello, QMC presentó una carta en la que argumentó que Ley Núm. 89-2000, *supra*, no requería el endoso del Municipio, por lo que reiteraba su solicitud de permiso de construcción.

Paralelamente, el 23 de marzo de 2010, el Sr. Víctor Rivera Pastrana presentó una Querella ante la ARPe. En ella, consignó su oposición a la construcción de la facilidad de telecomunicaciones. Ante esto, se celebró una vista administrativa en donde testificaron el señor Rivera Pastrana y la Sra. Zulma I. Figueroa Marti. Esta última se opuso a la solicitud de permiso porque la ubicación de la facilidad afectaría el valor de su propiedad y planes futuros, dado que

parte de su propiedad se encontraba dentro del radio de seguridad. Por su parte, QMC presentó un "Radio Frequency Hazard Assessment", un "Power Density Simulation" y una certificación del Ing. Roger R. Fraiters Negrón, en las cuales indicó que las emisiones de la facilidad de telecomunicaciones no excederían los límites máximos permitidos por la Comisión Federal de Comunicaciones (FCC, por sus siglas en inglés). También presentó la declaración jurada del Ing. Axel Hernández Vázquez, quien certificó que se había notificado a todos los vecinos dentro de una distancia de cien metros de la construcción propuesta. Tras la celebración de la vista, treinta y nueve vecinos presentaron ante la ARPe una carta expresando sus preocupaciones con la facilidad de telecomunicaciones.

El 16 de noviembre de 2010, la ARPe emitió una Resolución mediante la cual desestimó la querella. Concluyó que QMC cumplió con toda la legislación y reglamentación aplicable. Señaló, además, que los vecinos no habían sustentado sus contenciones con evidencia, mientras que QMC presentó todos los documentos requeridos por la agencia. Por ello, el 14 de marzo de 2011, la ARPe emitió el permiso de construcción a favor de QMC. No obstante, no notificó esta Resolución a la señora Figueroa Marti ni al Sr. José M. Crespo Morales.

En vista de lo anterior, estos últimos presentaron una Querella en la Oficina del Inspector General de Permisos (OIGPe), agencia creada por la Ley para la Reforma del

Proceso de Permisos de Puerto Rico, Ley Núm. 161-2009, 23 L.P.R.A. sec. 90011, *et seq.* (Ley Núm. 161-2009). El 9 de agosto de 2011, la OIGPe ordenó a la antigua ARPe, ahora Oficina de Gerencia y Permisos (OGPe), a notificar la referida Resolución. La OGPe notificó nuevamente la Resolución el 30 de septiembre de 2011.

Inconformes, los peticionarios presentaron un escrito de revisión administrativa ante la Junta Revisora. Alegaron violación al debido proceso de ley y que parte de la propiedad de la señora Figueroa Marti, específicamente, la terraza, unos columpios, una estructura de almacenamiento de herramientas y una estructura de cultivos hidropónicos, se encontraba dentro del radio de seguridad. La OGPe se opuso a la solicitud de revisión. Estando el recurso pendiente ante su consideración, la Junta Revisora declaró con lugar una solicitud de intervención presentada por el Municipio y los hijos de la señora Figuera Marti. Tras la celebración de una vista, la Junta Revisora emitió una Resolución el 16 de febrero de 2013. En esta, confirmó la expedición del permiso de construcción. Entendió que QMC había cumplido con los requisitos legales y reglamentarios que rigen la presentación, tramitación y evaluación de permisos.

Aún inconformes, el Municipio, el Alcalde, el señor Crespo Morales y la señora Figueroa Marti, por sí y en representación de sus hijos menores de edad, presentaron un recurso de *certiorari* ante nos. El 5 de junio de 2012, acordamos expedir para revisar únicamente el siguiente

señalamiento de error: "[e]rró la Junta Revisora al confirmar el permiso de la construcción a pesar de que se violan las distancias de seguridad vigentes en derecho".[1] Así las cosas, las partes presentaron sus alegatos y comparecieron como amigos de la corte la Junta Reglamentadora de Telecomunicaciones, T-Mobile de Puerto Rico, LLC, PRTC/Claro, Open Mobile, Sprint, AT&T y la "Personal Communications Industry Association". Además, el 7 de mayo de 2013, celebramos una vista oral en donde surgió una controversia en torno a la jurisdicción de este Tribunal para atender la controversia en los méritos. Por lo tanto, solicitamos a las partes que presentaran memorandos de derecho con sus posiciones al respecto. Con el beneficio de la comparecencia de todas las partes, procedemos a resolver.

II.

*A. Jurisdicción*

Según hemos reiterado en múltiples ocasiones, la jurisdicción es el poder o autoridad de un tribunal para considerar y decidir casos y controversias. <u>S.L.G. Solá-Moreno v. Bengoa Becerra</u>, 182 D.P.R. 675, 682 (2011). Los tribunales debemos ser celosos guardianes de nuestra jurisdicción, por lo que los asuntos concernientes a la jurisdicción son privilegiados y deben ser atendidos de forma preferente. <u>González v. Mayagüez Resort & Casino</u>, 176 D.P.R.

---

[1] Las Juezas Asociadas señoras Fiol Matta y Rodríguez Rodrígez y el Juez Asociado señor Estrella Martínez hubieran atendido los señalamientos de error adicionales.

848, 856 (2009). Al tratarse de un asunto que incide sobre el poder del tribunal para adjudicar una controversia, la falta de jurisdicción se puede levantar *motu proprio* pues un tribunal no tiene discreción para asumir jurisdicción donde no la hay. Souffront v. A.A.A., 164 D.P.R. 663, 674 (2005). Si un tribunal carece de jurisdicción, solo resta así declararlo y desestimar la reclamación sin entrar en los méritos de la controversia. Íd. Con este marco normativo, debemos evaluar la Ley Núm. 161-2009, *supra*, para determinar si tenemos jurisdicción para atender el presente recurso.

La Ley Núm. 161-2009, *supra*, se adoptó para establecer un procedimiento nuevo para la solicitud, evaluación y concesión de permisos de uso, construcción y desarrollo de terrenos en Puerto Rico. Exposición de Motivos, Ley Núm. 161-2009, *supra*. Esta ley derogó la Ley Orgánica de la Administración de Reglamentos y Permisos, Ley Núm. 76 de 24 de junio de 1975, 23 L.P.R.A. ant. sec. 71, *et seq.* (Ley Núm. 76-1975). Así pues, la ARPe quedó reemplazada por la OGPe como la agencia administrativa encargada de la concesión de permisos. 23 L.P.R.A. sec. 9012d. No obstante, el Art. 19.10 de la Ley Núm. 161-2009, 23 L.P.R.A. sec. 9011 nota, dispuso que la Ley Núm. 76-1975 sería derogada "al año de entrar en vigor esta ley". Por su parte, a pesar de que la Ley Núm. 161-2009, *supra*, entró en vigor inmediatamente, es decir, el 1 de diciembre de 2009, el Art. 19.13 estableció un periodo de transición de un año:

[e]xcepto por el Artículo 19.10, todos los Artículos de esta Ley entrarán en vigor inmediatamente a partir de su aprobación.…

No obstante, habrá un periodo de transición de un (1) año contado a partir de la aprobación de esta Ley. El Gobernador, o la persona en quien él delegue, tendrá facultad para adoptar aquellas medidas transitorias y tomar las decisiones necesarias para que se efectúe la transferencia ordenada por esta Ley sin que se afecten los servicios ni la programación normal de las funciones transferidas. 23 L.P.R.A 9011 nota.

La Ley Núm. 161-2009, *supra*, también alteró el procedimiento de revisión de las determinaciones de la Junta Revisora. Previo a su aprobación, el foro con jurisdicción para atender las revisiones de la Junta de Apelaciones sobre Construcciones y Lotificaciones era el Tribunal de Apelaciones de acuerdo a la Ley de Procedimiento Administrativo Uniforme (LPAU). 3 L.P.R.A. 2101 *et seq.* Luego de su aprobación, el foro con jurisdicción para atender las revisiones de la Junta Revisora era este Tribunal. 23 L.P.R.A. sec. 9023. No obstante, nos vimos obligados a aclarar este particular dada la confusión generada por el lenguaje de la Ley Núm. 161-2009, *supra*, y varias sentencias inconsistentes de varios paneles del Tribunal de Apelaciones.

A esos efectos, en Cordero v. OGPe, *supra*, aclaramos que, al amparo del Art. 11.13 de la Ley Núm. 161-2009, 23 L.P.R.A. sec. 9021*l*, los casos pendientes de adjudicación ante la antigua Junta de Apelaciones al momento de entrar en vigor la ley se transferían a la Junta Revisora. Íd., págs. 459-460. Ese foro resolvería la petición basado en la ley vigente al momento de la presentación de la solicitud. Íd. Además,

también expresamos que: "**lo dispuesto en el Artículo 13.1 de la Ley Núm. 161-2009 en lo atinente a las revisiones de las determinaciones de la Junta Revisora ante este tribunal, es aplicable únicamente a casos adjudicados por la Junta Revisora sobre solicitudes que fueron presentadas o adjudicadas por la O.G.Pe. a partir del 1 de diciembre de 2010**". Íd., págs. 462-463. (Énfasis suplido). Sin embargo, un análisis integral de la ley, requiere que dejemos sin efecto esas expresiones. Veamos.

La Ley Núm. 161-2009, *supra*, es consistente al disponer que los casos pendientes al momento de su aprobación serán resueltos "al amparo de las disposiciones bajo las cuales se hubiesen **iniciado**", Art. 2.21 de la Ley Núm. 161-2009, 23 L.P.R.A. sec. 9012t, "bajo las disposiciones de ley aplicables **al momento de la presentación** de dichas solicitudes", Art. 18.2 de la Ley Núm. 161-2009, 23 L.P.R.A. sec. 9028a, y "al amparo de las disposiciones de las leyes y reglamentos vigentes **al momento de la presentación** de la solicitud objeto de la revisión", Art. 11.13 de la Ley Núm. 161-2009, 23 L.P.R.A. sec. 9021*l*. (Énfasis suplido). Vemos, pues, que la ley es clara al establecer la fecha de presentación de la solicitud de permiso como el momento que determina cuál ley aplicará al proceso. Consecuentemente, la ley no menciona que esta será de aplicación a casos **adjudicados** luego de su vigencia. Por otro lado, **la Ley Núm. 161-2009**, *supra*, **es clara al establecer que sus disposiciones aplicarán a los casos iniciados luego de su fecha de**

**vigencia. Esta entró en vigor el 1 de diciembre de 2009, no el 1 de diciembre de 2010.** Por lo anterior, dejamos sin efecto nuestras expresiones relativas a que ostentamos jurisdicción para revisar casos sobre solicitudes **"adjudicadas por la O.G.Pe. a partir del 1 de diciembre de 2010"**. (Énfasis suplido). Cordero, *et al*. v. ARPe. *et al.*, *supra*, pág. 463.

**Por lo tanto, el Art. 13.1 que designa a este Tribunal como el foro con jurisdicción para revisar las determinaciones de la Junta Revisora, es de aplicación a todos los casos relacionados con solicitudes presentadas después de la vigencia de la ley, es decir, el 1 de diciembre de 2009.**[2]

En el caso de epígrafe, la solicitud de permiso de construcción fue presentada el 16 de marzo de 2010, es decir, tres meses después de la fecha de vigencia de la Ley Núm. 161-2009. Por tal razón, nos debemos regir por sus disposiciones. Consiguientemente, de acuerdo al Art. 13.1 de la ley, *supra*, esta Alta Curia es el foro con jurisdicción para revisar el dictamen recurrido.

Concluido que somos el foro con jurisdicción para atender el recurso de *certiorari*, pasemos a examinar en los méritos la controversia.

*B. Ley Federal de Telecomunicaciones*

---

[2] Por no estar en controversia en este caso, no es necesario expresarnos sobre la enmienda introducida por el Art. 7 de la Ley Núm. 18-2013, al Art. 13.1 de la Ley Núm. 161-2009, *supra*.

La Ley Federal de Telecomunicaciones, 47 U.S.C.A. secs. 151, *et seq.* (Ley Federal de Telecomunicaciones), se adoptó para regular la prestación de servicios de telecomunicaciones y para crear la FCC. La misma establece un régimen de desregulación dirigido a eliminar las barreras de competencia en el campo de las telecomunicaciones y así abrir el mercado a la libre competencia. Íd. Además, el estatuto eliminó todas las franquicias de monopolios de las compañías locales, impuso obligaciones a los acarreadores de servicios telefónicos y prohibió a los acarreadores locales establecer condiciones discriminatorias o prohibir la reventa de los servicios de telecomunicaciones. Íd. Véase además, <u>Caribe Communications v. P.R.T.C.</u>, 157 D.P.R 203, 216 (2002).

Esta ley ocupó el campo con relación a los posibles efectos ambientales y de salud asociados con la construcción, instalación y uso de torres de servicios móviles. 47 U.S.C.A. sec. 332(c)(7). En específico, se dispuso que ningún estado puede denegar un permiso para la construcción de una facilidad de telecomunicaciones siempre y cuando se cumpla con la reglamentación promulgada por la FCC. Íd. No obstante, este mismo articulado reconoce un área limitada que puede ser objeto de regulación por parte de los estados:

(7) Preservation of local zoning authority:

(A) General authority: Except as provided in this paragraph, nothing in this chapter shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement,

construction, and modification of personal wireless service facilities.

(B) Limitations:

(i) The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof—

(I)    shall not unreasonably discriminate among providers of functionally equivalent services; and

(II)   shall not prohibit or have the effect of prohibiting the provision of personal wireless services.

(ii) A State or local government or instrumentality thereof shall act on any request for authorization to place, construct, or modify personal wireless service facilities within a reasonable period of time after the request is duly filed with such government or instrumentality, taking into account the nature and scope of such request.

(iii) Any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record.

(iv) No State or local government or instrumentality thereof may regulate the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the Commission's regulations concerning such emissions. Íd.

Como se desprende de esta sección, los estados pueden –

de forma limitada– regular la ubicación, construcción y

modificación de torres de servicios móviles. No obstante, deben velar por que este tipo de regulación no discrimine entre proveedores de servicios de telecomunicaciones que brinden servicios funcionalmente similares, ni prohíba o tenga el efecto de prohibir, el acceso a servicios inalámbricos personales. Íd.

C.   *Ley de Telecomunicaciones de Puerto Rico y Ley sobre la Construcción, Instalación y Ubicación de Torres de Telecomunicaciones de Puerto Rico*

Como contraparte estatal a la Ley Federal de Telecomunicaciones, la Asamblea Legislativa aprobó la Ley de Telecomunicaciones de Puerto Rico, Ley Núm. 213-1996, 27 L.P.R.A. sec. 256, *et seq.* (Ley Núm. 213-1996). Esta fue adoptada para promover la competencia total, igual y leal entre las compañías que forman parte de ese mercado. Exposición de Motivos de la Ley Núm. 213-1996, *supra*. Además, busca asegurar acceso a mejores y más variados servicios de telecomunicaciones a costos razonables. Íd. Véase, además, Claro TV y Junta Regl. Tel. v. OneLink, 179 D.P.R. 177, 188-193 (2010).

Específicamente, se estableció como política pública en el área de las telecomunicaciones, entre otros propósitos: reconocer que el servicio de telecomunicaciones persigue un interés público dentro de un mercado competitivo; proveer servicio universal a un costo justo, razonable y asequible para todos los ciudadanos; asegurar un amplio número de posibilidades competitivas en la oferta de servicios y facilidades de telecomunicaciones; promover la competencia y

utilizar las fuerzas del mercado como factor primordial en la determinación de precios, términos, disponibilidad y condiciones de servicios; asegurar que no existan barreras reglamentarias ni procedimientos administrativos innecesarios que entorpezcan la competencia en el mercado; simplificar el proceso reglamentario en aquellas situaciones en que la reglamentación sea necesaria y dirigir la reglamentación para el bienestar del consumidor; penalizar las prácticas anticompetitivas en el mercado de telecomunicaciones; desempeñar la función de guardián del ambiente competitivo; y proveer servicios de telecomunicaciones a todos los consumidores del país, incluyendo aquellos que tienen bajos ingresos o residen en áreas rurales o en áreas en que sea costosa la instalación de estos servicios. 27 L.P.R.A. sec. 265.

Por otro lado, y basado en la autoridad reservada a los estados en la Sec. 332(c)(7) de la Ley Federal de Telecomunicaciones, *supra*, se aprobó la Ley sobre la Construcción, Instalación y Ubicación de Torres de Telecomunicaciones de Puerto Rico, Ley Núm. 89-2000, *supra*. Mediante esta ley se busca regular la construcción de las referidas torres y, a su vez, proteger la seguridad y los derechos de los ciudadanos, estableciendo un balance entre ambos intereses. Exposición de Motivos de la Ley Núm. 89-2000, *supra*. A tono con este fin, se estableció como política pública la co-ubicación de antenas de telecomunicaciones en una misma facilidad y la armonización de las necesidades de

cobertura de las empresas de telecomunicaciones con los intereses de la ciudadanía. Íd.

Según el Art. 3 de esta ley, "[l]a proliferación de torres que albergan antenas en zonas urbanas o en las cercanías de residencias crea desasosiego y temor por la seguridad y vida de dichos titulares y requiere de legislación que armonice los intereses comerciales con el de los ciudadanos de modo que se logre una convivencia sana y una mejor calidad de vida". 27 L.P.R.A. sec. 321. Así pues, la Ley Núm. 89-2000, *supra*, establece una serie de requisitos previo al otorgamiento de permisos de construcción de facilidades de telecomunicaciones. En síntesis, hay exigencias de notificación a vecinos o colindantes, normas en torno a la co-ubicación de las antenas y, de especial importancia para el caso de autos, requisitos de distancia entre las torres y residencias aledañas. Véase, 27 L.P.R.A. secs. 323-325. Con relación a esto último, la ley dispone que:

> (a) Excepto como más adelante se dispone **la construcción de toda torre de telecomunicaciones en un distrito residencial o rural,** según las clasificaciones de la Junta de Planificación o de los municipios autónomos autorizados a emitir dichas clasificaciones, por la Junta de Planificación conforme a las secs. 4001 et seq. del Título 21, conocidas como 'Ley de Municipios Autónomos', **deberá guardar una distancia no menor de la altura de la torre, más un diez por ciento (10%) adicional de la residencia más cercana.** Este requisito no será de aplicación si el incumplimiento con las disposiciones de este capítulo no fue creado por el dueño de la torre y sí por desarrollos posteriores autorizados por la Junta de Planificación, en cuyo caso la torre podrá permanecer en su ubicación original. Se permitirá

la ubicación de una torre que no cumpla con lo establecido en este inciso en aquellos casos donde el dueño de la torre y la residencia más cercana sea un mismo titular o, aún siendo dueños distintos, el titular de la residencia permita por declaración jurada la ubicación de la torre en el lugar propuesto siempre que no haya otra residencia existen[te] dentro del radio de distancia dispuesto por este capítulo que no haya consentido dicha ubicación mediante declaración jurada. (Énfasis suplido). 27 L.P.R.A. sec. 323(a).

Además de la Ley Núm. 89-2000, *supra*, la Junta de Planificación (JP) adoptó el Reglamento de Planificación Núm. 26 (Reglamento Núm. 26), reglamento vigente a la fecha de la solicitud del permiso en controversia. Este perseguía principios análogos a la Ley Núm. 89-2000, *supra*. En cuanto al radio de seguridad, el Reglamento Núm. 26 disponía que:

[l]as torres de telecomunicaciones podrán permitirse dentro de los límites territoriales del Estado Libre Asociado de Puerto Rico cumpliendo con las siguientes disposiciones: (1) Distancia de la Residencia más cercana – la torre deberá guardar una distancia no menor de la altura de la torre más un diez por ciento (10%) adicional medidos desde la residencia más cercana. Íd.

No obstante, y según señalado anteriormente, ninguna de estas disposiciones legales define expresamente el término "residencia".[3]

D. *Principios de hermenéutica*

En ausencia de una definición del término "residencia" en la Ley Núm. 89-2000, *supra*, y en el Reglamento Núm. 26, es

---

[3] El Reglamento Conjunto de Permisos para Obras de Construcción y Uso de Terrenos del 30 de noviembre de 2010, Reglamento de Planificación Núm. 31 (Reglamento Núm. 31), derogó el Reglamento Núm. 26. El capítulo 44 del Reglamento Núm. 31 sobre Proyectos de Construcción, Instalación y Ubicación de Torres y Facilidades de Telecomunicaciones tampoco define el término residencia.

necesario recurrir a los principios de hermenéutica prevalecientes en nuestro ordenamiento jurídico. Es norma reiterada que todas las leyes, aunque sean claras, requieren interpretación. Otero de Ramos v. Srio. de Hacienda, 156 D.P.R. 876, 883-884 (2002). Cuando el lenguaje de una ley es claro, el texto es la expresión por excelencia de la intención legislativa. Íd., pág. 900. Por ello, al analizar una ley se debe acudir primero al propio texto, pues si el lenguaje es claro y libre de ambigüedad, no debe ser menospreciado bajo el pretexto de cumplir con su espíritu. Art. 14 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 14.

No obstante, la interpretación de una ley no puede ser únicamente literal, ni únicamente lógica, sino ambas a la vez. Sucn. Álvarez v. Scto. de Justicia, 150 D.P.R. 252, 275-276 (2000). Se debe rechazar cualquier interpretación que conduzca a resultados absurdos. Íd. Además, la interpretación correcta de una ley requiere el estudio y análisis del texto íntegro, pues la lectura aislada y desconectada puede crear confusión. Sánchez Díaz v. E.L.A., 181 D.P.R. 810, 822-823 (2011).

De surgir alguna ambigüedad en el texto del estatuto, el tribunal debe asegurarse que la interpretación cumple con los propósitos legislativos. Morales v. Marengo, 181 D.P.R. 852, 859 (2011). Así pues, al interpretar una disposición específica de una ley, los tribunales deben considerar cuáles fueron los propósitos perseguidos por la Asamblea Legislativa al aprobarla y la interpretación debe atribuirle un sentido

que asegure el resultado que originalmente se quiso obtener. J.P. v. Frente Unido I, 165 D.P.R. 445, 472 (2005).

Por otra parte, según el Art. 15 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 15, las palabras de una ley deben ser entendidas en su más corriente y usual significación, sin atender demasiado al rigor de las reglas gramaticales, sino al uso general y popular de las voces. Véase además, Sucn. Toro v. Sucn. Toro, 161 D.P.R. 391, 401-402 (2004). Si el estatuto no contiene una definición del término en controversia, este debe entenderse en el sentido ordinario y usual que se le adscribe, tomando en consideración que la interpretación judicial debe hacerse con fines socialmente útiles. Sánchez Díaz v. E.L.A., *supra*, pág. 825. De forma que, cuando en el estatuto los términos son claros y susceptibles de una interpretación incuestionable, según el significado común de sus palabras y de su construcción gramatical, los tribunales no deben intercalar palabras ni suplir omisiones al interpretarlo. Irizarry v. J & J Cons. Prods. Co., Inc., 150 D.P.R. 155, 165 (2000).

III.

En el caso ante nuestra consideración, la Junta Revisora determinó que el 56.6% de la propiedad de la señora Figueroa Marti se encuentra dentro del radio de seguridad establecido en la Ley Núm. 89-2000, *supra*. Además, quedó probado que dentro del referido radio se encuentra: (1) parte de la terraza no techada, pero adherida a la residencia; (2) unos cultivos hidropónicos; (3) un área de juegos utilizados por

los hijos de la señora Figueroa Marti que contiene un columpio y un trampolín; y (4) una estructura para almacenamiento de herramientas.

No obstante, la Junta Revisora confirmó la autorización emitida por la ARPe a QMC para la construcción de la facilidad de telecomunicaciones. Para poder otorgar el permiso, tanto la ARPe como la Junta Revisora determinaron que el radio de seguridad debía tomar en cuenta únicamente las paredes de la casa, sin incluir la terraza, el área de juegos, la estructura de almacenamiento ni el cultivo hidropónico. Esa misma interpretación es la que nos invita a adoptar QMC.

Sin embargo, esta interpretación no se sostiene tras un análisis del historial legislativo de la Ley Núm. 89-2000, *supra*, de acuerdo a los principios de hermenéutica que rigen en nuestro ordenamiento. Veamos.

Surge de la Exposición de Motivos de la Ley Núm. 89-2000 que:

> [n]o se puede limitar ni menoscabar el reclamo de personas y comunidades **sobre la seguridad de sus propiedades** y su salud personal por condiciones reglamentarias creadas por el propio Gobierno.
>
> [...]
>
> Durante la emergencia ocurrida en el país con motivo del paso del Huracán Georges el pasado 21 de septiembre de 1998, tuvimos la experiencia en distintos lugares de Puerto Rico de torres que colapsaron debido a las fuerzas de los vientos huracanados que azotaron a nuestra isla. Hasta el momento no ha ocurrido ninguna desgracia en la que se vean afectadas las vidas de las personas aunque **el peligro siempre estará latente mientras una torre esté ubicada dentro del radio de una**

**residencia.** Esta Ley tiene como finalidad regular la construcción de las referidas torres y **a la vez proteger la seguridad de nuestros ciudadanos.**

[…]

El único propósito de esta Ley es establecer un balance entre los intereses de nuestros ciudadanos y el desarrollo de nuestras áreas residenciales. **La preocupación de la ciudadanía con relación a sus propiedades y seguridad es una genuina que amerita la más pronta atención de esta Asamblea Legislativa.** Exposición de Motivos, Ley Núm. 89-2000, *supra.* (Énfasis suplido).

Es decir, la Asamblea Legislativa reconoció expresamente el reclamo legítimo de los individuos y comunidades sobre su seguridad y la de sus **propiedades y residencias.** Ahora bien, al imponer el requisito del radio de seguridad, se utilizó la palabra "residencia" en vez de "propiedad" o "colindancia".

Por ello, para determinar a qué se circunscribe el término "residencia" para efectos de la Ley Núm. 89-2000, *supra*, debemos regirnos por los principios de hermenéutica y buscar el significado más corriente y usual, atendiendo al uso general y popular de las voces. A esos efectos, el Diccionario de la Real Academia Española define la palabra residencia, en lo pertinente, como: "lugar donde se reside; **casa** en que se vive […]".[4] (Énfasis suplido). Es decir, residencia es lo que popularmente conocemos como casa u hogar. A su vez, casa es definido como: "edificio para

---

[4] Diccionario de la Lengua Española, en: http://lema.rae.es/drae/?val=residencia (última visita, 29 de enero de 2014).

habitar".[5] Por su parte, "terraza" se define como: "sitio abierto de una **casa** desde el cual se puede explayar la vista".[6] (Énfasis suplido). Así pues, resulta forzoso reconocer que la terraza, es decir, la construcción de la casa expuesta al exterior, independientemente de que esté techada o no, está comprendida bajo el concepto "residencia" de la Ley Núm. 89-2000, *supra*. Dado que en el caso de epígrafe, parte de la terraza de la señora Figueroa Marti se encuentra dentro del radio de seguridad y que ello es suficiente para revocar el permiso en cuestión, no es necesario expresarnos sobre las estructuras accesorias.

Ciertamente, no podemos pasar por alto que la Ley Núm. 89-2000, *supra*, busca armonizar los reclamos de los ciudadanos con la necesidad de contar con los avances tecnológicos que proveen las telecomunicaciones, ambos intereses legítimos. Por esto, es preciso aclarar que el término residencia incluye la terraza, siempre y cuando se encuentre construida o en proceso de construcción al momento de la solicitud del permiso de edificación de la facilidad de telecomunicaciones. Así evitamos que, con el único propósito de impedir la instalación de una facilidad de telecomunicaciones que cumple con el requisito del radio de seguridad, se realicen desarrollos posteriores a la

---

[5]    Diccionario de la Lengua Española, en: http://lema.rae.es/drae/?val=casa (última visita, 29 de enero de 2014).

[6]    Diccionario de la Lengua Española, en: http://lema.rae.es/drae/?val=terraza (última visita, 20 de noviembre de 2013).

residencia que tengan como consecuencia colocar la torre dentro del radio seguridad.

IV.

En vista de que la terraza de la señora Figuera Marti es parte de su residencia para fines de la Ley Núm. 89-2000, *supra*, y que la Junta Revisora determinó que parte de esta se encuentra dentro del radio de seguridad, se revoca la determinación de la Junta Revisora. Consecuentemente, se revoca la expedición del permiso de construcción de la facilidad de telecomunicaciones solicitado por QMC por no cumplir con la disposición sobre el radio de seguridad de la Ley Núm. 89-2000, *supra*.

Se dictará sentencia de conformidad.

Federico Hernández Denton
Juez Presidente

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Municipio Autónomo de San Sebastián, et al<br><br>Peticionarios<br><br>v.<br><br>QMC Telecom, LLC; Oficina de Gerencia de Permisos y otros<br><br>Recurridos | CC-2012-233 | |

SENTENCIA

En San Juan, Puerto Rico, a 24 de marzo de 2014.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte de la presente Sentencia, se revoca la determinación de la Junta Revisora. Consecuentemente, se revoca la expedición del permiso de construcción de la facilidad de telecomunicaciones solicitado por QMC por no cumplir con la disposición sobre el radio de seguridad de la Ley Núm. 89-2000, *supra*.

Lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Kolthoff Caraballo emitió una Opinión Disidente a la cual se unen los Jueces Asociados señores Rivera García y Feliberti Cintrón. El Juez Asociado señor Martínez Torres y la Jueza Asociada señora Pabón Charneco no intervienen.

Aida I. Oquendo Graulau
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Municipio Autónomo de San Sebastián, y su Alcalde el Sr. Javier Jiménez Pérez; Zulma I. Figueroa por sí y en representación de sus hijos menores de edad Rachel Marie Segarra y Eric Gabriel Segarra; José M. Crespo Morales<br><br>Peticionarios<br><br>v.<br><br>QMC Telecom, LLC; Oficina de Gerencia de Permisos; Junta Revisora de Permisos y Uso de Terrenos<br><br>Recurridos | CC-2012-233 | Certiorari |

Opinión Disidente emitida por el Juez Asociado señor Kolthoff Caraballo a la cual se unen los Jueces Asociados señores Rivera García y Feliberti Cintrón

San Juan, Puerto Rico, a 24 de marzo de 2014.

En el presente caso me veo precisado a disentir de la Opinión mayoritaria, por entender que la Junta Revisora de Permisos y Uso de Terrenos (Junta Revisora) no erró al determinar que QMC Telecom, LLC (QMC), cumplió con el radio de seguridad.

**I**

Los hechos del caso de epígrafe están muy bien expuestos en la Opinión del Tribunal por lo que consideramos innecesario reproducirlos. Así, pasamos a discutir el derecho aplicable a la controversia ante nuestra consideración.

**II**

**A. Ley Núm. 89-2000,[7] según enmendada, mejor conocida como la Ley sobre la Construcción, Instalación y Ubicación de Torres de Telecomunicaciones de Puerto Rico**

El 6 de junio de 2000, la Asamblea Legislativa creó la Ley Núm. 89-2000, *supra*, para lograr el desarrollo ordenado, aprovechar al máximo nuestras facilidades de infraestructuras y evitar el crecimiento exponencial de torres de telecomunicaciones en la Isla.[8] Esta ley adoptó como política pública el uso integrado de las facilidades de telecomunicaciones.

Por otro lado, la Ley Núm. 89-2000, *supra*, facultó a la Junta de Planificación (JP) a establecer un reglamento para atemperar la reglamentación vigente hasta ese momento a los propósitos perseguidos por esta ley. Así las cosas, el 23 de julio de 2003 la JP, mediante Resolución Núm. JP-RP-26-1-2003, derogó el Reglamento Núm. 6064 y lo sustituyó por el Reglamento Núm. 6721

---

[7] 27 LPRA sec. 321 *et seq.*

[8] Véase Exposición de Motivos de la Ley Núm. 89-2000, *supra*.

(Reglamento de Planificación Núm. 26).[9] Este reglamento perseguía objetivos análogos a los que promueve la Ley Núm. 89-2000, *supra*.

Tanto la Ley Núm. 89-2000, *supra*, como el Reglamento de Planificación Núm. 26, buscan armonizar no solo los intereses comerciales, sino también los de los ciudadanos. Como expresa la Opinión de este Tribunal, a los fines de cumplir con el objetivo de "establecer un balance entre los intereses de nuestros ciudadanos y el desarrollo de nuestras áreas residenciales", esta ley se encargó de establecer los parámetros que deben regir en el proceso de otorgamiento de permisos de construcción para la edificación de torres de telecomunicaciones.[10] De esta manera, se crea un balance entre los avances de la tecnología, en consideración al desarrollo ordenado de Puerto Rico y el aprovechamiento máximo de la infraestructura disponible.

**Ahora bien, la Ley Núm. 89-2000, *supra*, es una ley de telecomunicaciones. Por lo tanto, es menester interpretar sus disposiciones en armonía con los demás**

---

[9] Cabe destacar que el Reglamento de Planificación Núm. 26 fue derogado por virtud del Reglamento Conjunto de Permisos para Obras de Construcción y Uso de Terrenos de 30 de noviembre de 2010, Reglamento Núm. 7951 (Reglamento de Planificación Núm. 31). No obstante, puesto que tanto el proceso sobre el permiso de construcción de QMC como la resolución emitida por la OGPe tuvieron lugar con anterioridad a la efectividad del Reglamento de Planificación Núm. 31, al estar aún vigente el Reglamento de Planificación Núm. 26, este es el reglamento aplicable a la controversia ante nuestra consideración.

[10] Véase Exposición de Motivos de la Ley Núm. 89-2000, *supra*. Opinión mayoritaria, pág. 13.

estatutos de telecomunicaciones tanto a nivel federal como local.

B. **Ley Federal de Comunicaciones**

En el 1934, el Congreso de Estados Unidos aprobó la Ley Federal de Comunicaciones, 47 USCA sec. 151 *et seq.* Esta ley proveyó para la creación de la Comisión Federal de Comunicaciones (FCC, por sus siglas en inglés) cuyo propósito primordial era regular el servicio telefónico interestatal.[11] Con relación a los servicios intraestatales estos eran regulados por las comisiones estatales.[12] Esta ley se creó principalmente para proteger a los consumidores de la AT&T, la cual -mediante una política intensa de consolidación- había adquirido un monopolio de todos los segmentos de la industria de las telecomunicaciones.[13] Por varias décadas, la sociedad había percibido a la industria telefónica como un "monopolio natural" que no permitía la competencia, en la que solo existía un proveedor de servicio y la que debía ser reglamentada para beneficio de los consumidores.[14] Como resultado de esta ideología monopolística, muchos estados permitieron que compañías locales adquirieran un

---

[11] PRTC v. J. Reg. Tel. de P.R., 151 DPR 269, 279 (2000).

[12] Íd.

[13] Íd., págs. 278-279.

[14] Íd.

monopolio de los servicios de telecomunicaciones.[15]  Sin embargo, a través de los años, con el desarrollo de la industria de telecomunicaciones y con el avance en la tecnología, muchos comenzaron a retar la premisa básica de la teoría del "monopolio natural".  Como resultado de ello, dicha teoría comenzó a deteriorarse y comenzaron a surgir nuevas oportunidades para la competencia.[16]

A tenor de lo anterior, la legislación federal fue objeto de adaptación, cambios y modificaciones. Finalmente, el Congreso aprobó la Ley Federal de Telecomunicaciones de 1996 (Ley Federal).  Como bien señala la Opinión mayoritaria, mediante esta nueva ley se abrió el mercado de las telecomunicaciones, promoviendo la competencia y estableciendo un régimen de desreglamentación dirigido a eliminar las barreras de la competencia.[17]  Para cumplir con este régimen, la Sec. 253 de la Ley Federal prohíbe a los estados legislar para impedir que una entidad provea servicios interestatales o intraestatales.

En cuanto a los servicios móviles, y por razón de los posibles efectos ambientales y de salud asociados a este tipo de antenas, la Ley Federal ocupó el campo. Así, esta ley estableció en la Sec. 332(c)(7) que ningún estado podrá denegar la construcción de una torre de

---

[15] Íd.

[16] Íd., citando a G.J. Guzzi, Breaking Up the Local Telephone Monopolies: The Local Competition Provisions of the Telecommunications Act of 1996, 39 B.C.L. Rev. 151 (1997).

[17] Véase Opinión mayoritaria, págs. 9-10.

telecomunicaciones por los riesgos a la salud que puedan causar las ondas de radio, siempre que estas cumplan con lo dispuesto por la FCC. Ahora bien, en la misma sección la Ley Federal indicó que no se limitará la autoridad de los estados para decidir sobre la construcción, instalación y ubicación de las torres.

Así pues, la Sec. 332(c)(7) de la Ley Federal recoge lo relacionado a la reglamentación que pueden establecer los estados en cuanto a servicios móviles. En lo pertinente, dispone:

> (7) Preservation of local zoning authority
>     (A) General Authority.--**Except as provided in this paragraph, nothing in this Act shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities.**
>     (B) Limitations.--
>         (i) The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof--
>             (I) shall not unreasonably discriminate among providers of functionally equivalent services; and
>             **(II) shall not prohibit or have the effect of prohibiting the provision of personal wireless services.**
>         (ii) ...
>
>         (iii) ...
>
>         **(iv) No State or local government or instrumentality thereof may regulate the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with**

> **the Commission's regulations concerning such emissions.**
> (Énfasis nuestro).

Como podemos observar, esta sección dispone que ningún estado puede imponer requisitos onerosos que impidan la instalación de servicios inalámbricos.

## C. **Ley Núm. 213-1996,**[18] **según enmendada, mejor conocida como la Ley de Telecomunicaciones de Puerto Rico (Ley de Telecomunicaciones)**

Como resultado de la aprobación de la Ley Federal, *supra*, la Asamblea Legislativa de Puerto Rico aprobó la Ley Núm. 213-1996, *supra.* Esta ley declaró como política pública reconocer el servicio de telecomunicaciones como uno cuya prestación persigue un fin de alto interés público, fomentar el desarrollo de la infraestructura de las telecomunicaciones, asegurar la disponibilidad del más amplio número de facilidades y asegurar que no existan barreras reglamentarias ni procedimientos administrativos innecesarios que entorpezcan la competencia en el mercado.[19] Además, propició que se proveyera el servicio universal a un costo justo, razonable y asequible para todos los ciudadanos.[20] De esta manera, la Asamblea Legislativa pretende asegurar que se le dé acceso al servicio de telecomunicaciones a

---

[18] 27 LPRA sec. 265 *et seq.*

[19] Clases A, B y C v. PRTC, 183 DPR 666, 675 (2011); Claro TV y Junta Regl. Tel. v. OneLink, 179 DPR 177, 188-189 (2010); Caribe Comms., Inc. v. PRTC, 157 DPR 203, 216-218 (2002).

[20] Claro TV y Junta Regl. Tel. v. OneLink, supra; Caribe Comms., Inc. v. PRTC, supra.

los consumidores en todo Puerto Rico, incluyendo a los de bajos ingresos económicos y los que residen en áreas rurales o en áreas en que sea costoso el acceso a tales servicios.[21]

Así, siguiendo el mismo objetivo de la Ley Federal, la Ley de Telecomunicaciones en su Art. I-2 declaró como política pública –en lo pertinente- lo siguiente:

> Será la política pública del Estado Libre Asociado de Puerto Rico:
>
> **(a) Reconocer el servicio de telecomunicaciones como uno cuya prestación persigue un fin de alto interés público dentro de un mercado competitivo;**
> **(b) que se provea el servicio universal a un costo justo, razonable y asequible para todos los ciudadanos;**
> ........
> **(e) fomentar la inversión de capital en el desarrollo de la infraestructura de las telecomunicaciones;**
> **(f) asegurar la disponibilidad del más amplio número de posibilidades competitivas en la oferta de servicios y facilidades de telecomunicaciones;**
> (g) **promover la competencia** y utilizar las fuerzas del mercado como factor primordial en la determinación de precios, términos, disponibilidad y condiciones de servicio;
> **(h) propiciar la interconexión y la interoperabilidad entre las compañías de telecomunicaciones;**
> ........
> (q) **Dar acceso a servicios de telecomunicaciones, razonablemente comparables a los provistos en áreas urbanas, a los consumidores en toda la Isla, incluyendo a los de bajos ingresos y los que residen en áreas rurales o en áreas en que sea costoso el acceso a tales servicios;**
> (r) **garantizar el disfrute del servicio brindado** sin temor de interrupciones o interferencias irrazonables. (Énfasis nuestro.)
> ........

---

[21] Íd.

En virtud de la política pública antes reseñada, la ley creó la Junta Reglamentadora de las Telecomunicaciones (Junta Reglamentadora) "como la agencia encargada de reglamentar los servicios de telecomunicaciones en Puerto Rico y de dar cumplimiento y administrar este capítulo",[22] confiriéndole los poderes y prerrogativas necesarios para cumplir con dicho propósito.[23] Como esta ley está fundamentada en la normativa federal, la Asamblea Legislativa limitó la jurisdicción de la Junta Reglamentadora a "todo aquello que no esté en conflicto con las disposiciones estatutarias y reglamentarias federales, especialmente las que corresponden a la Comisión Federal de Comunicaciones, así como aquellas normas federales que ocupen el campo".[24]

### III

El Art. 5 de la Ley Núm. 89-2000, *supra,* establece que toda torre de telecomunicaciones ubicada en un distrito residencial deberá guardar una distancia no menor de la altura de la torre más un diez por ciento adicional de la <u>residencia</u> más cercana. Sin embargo, y como señala la Opinión mayoritaria, al leer dicha ley y el Reglamento de Planificación Núm. 26, *supra*, podemos

---

[22] Véase Exposición de Motivos de la Ley Núm. 213-1996, *supra;* <u>PRTC v. J. Reg. Tel. de P.R.</u>, supra, pág. 280.

[23] <u>Caribe Comms., Inc. v. PRTC</u>, supra, págs. 218-219; <u>PRTC v. J. Reg. Tel. de P.R.</u>, supra, pág. 280.

[24] Véase <u>Claro TV y Junta Regl. Tel. v. OneLink</u>, supra, pág. 196; 27 LPRA sec. 267e(a).

observar que no proveen una definición de qué se entenderá por "residencia" o, más bien, si dicho término incluye aquellas edificaciones inmediatamente anexas a la estructura principal de la casa. Así las cosas, en ausencia de una definición de "residencia" es menester recurrir a los principios de hermenéutica para interpretar dicho estatuto.

Nuestro ordenamiento jurídico establece que al analizar una ley se debe acudir primero al propio texto, pues si el lenguaje es claro y libre de ambigüedad, no debe ser menospreciado bajo el pretexto de cumplir con su espíritu.[25] No obstante, cuando existe alguna ambigüedad en la ley esta debe ser interpretada de manera que tal interpretación cumpla con el propósito legislativo.[26]

A tenor de lo anterior, entiendo que la mayoría de este Tribunal se equivoca al interpretar la ley sin analizar el propósito legislativo por el cual se incluyó la palabra "residencia" en el texto de esta. **La Opinión mayoritaria se circunscribe a la definición de "residencia" y "terraza" que produce el Diccionario de la Real Academia Española. Así, erra la mayoría al obviar que los estatutos cardinales a esta controversia son particulares de una industria. Por lo tanto, sus términos deben interpretarse bajo el crisol de la intensión del legislador dirigida a cumplir con las**

---

[25] Art. 14 Código Civil de Puerto Rico, 31 LPRA sec. 14.

[26] Morales v. Marengo, 181 DPR 852, 859 (2011).

necesidades de dicha industria; en este caso, las telecomunicaciones.

En primer término, la Opinión mayoritaria no hace un análisis del propósito por el cual se creó la Ley Núm. 89-2000 ni la intención que tuvo el legislador al incluir la palabra "residencia" en el texto de la ley, en vez de "propiedad" o "colindancia". Aunque bien es cierto que la palabra de una ley debe ser entendida en su más corriente y usual significado,[27] es claro también que tal significado, en buena hermenéutica jurídica, no puede en aras de lo cotidiano escabullirse de aquello que se ajusta, en estricta lógica, a lo que el legislador pretendió.

Por lo tanto, en el caso de autos nos correspondía encontrar la voluntad del legislador y llenar el vacío utilizando las leyes de telecomunicaciones como marco de referencia y analizando el propósito por el cual se creó la Ley Núm. 89-2000, *supra*. Veamos.

*El aspecto de la seguridad en la Ley Núm. 89-2000.*

Para poder evaluar en su justa perspectiva la determinación de la Junta Revisora en este caso, es menester iniciar el análisis de la controversia enmarcándola en el contexto del propósito que persigue el Art. 5 de la Ley Núm. 89-2000, *supra,* y la Sec. 3.02 del Reglamento de Planificación Núm. 26, pues fue exclusiva y expresamente a base de estas que la Agencia definió el

---

[27] Art. 15 del Código Civil de Puerto Rico, 31 LPRA sec. 15.

término "residencia". Es claro que ambas disposiciones tienen como propósito el que se establezca un radio de seguridad entre una torre de telecomunicaciones y las residencias aledañas.

Así, ambos preceptos disponen que **una torre de telecomunicaciones ubicada en un distrito residencial o rural deberá guardar una distancia no menor de la altura de la torre más un diez por ciento adicional de la residencia más cercana.** En particular, el Art. 5 de la ley establece:

> a) Excepto como más adelante se dispone la construcción de toda torre de telecomunicaciones en un distrito residencial, o rural según las clasificaciones de la Junta de Planificación o de los Municipios Autónomos autorizados a emitir dichas clasificaciones, por la Junta de Planificación conforme a la Ley de Municipios Autónomos, deberá guardar una distancia no menor de la altura de la torre, más un diez por ciento (10%) adicional de la <u>residencia</u> más cercana. Este requisito no será de aplicación si el incumplimiento con las disposiciones de esta Ley no fue creado por el dueño de la torre y sí por desarrollos posteriores autorizados por la Junta de Planificación, en cuyo caso la torre podrá permanecer en su ubicación original. Se permitirá la ubicación de una torre que no cumpla con lo establecido en este inciso en aquellos casos donde el dueño de la torre y la residencia más cercana sea un mismo titular o, aún siendo dueños distintos, el titular de la residencia permita por declaración jurada, la ubicación de la torre en el lugar propuesto siempre que no haya otra residencia existente dentro del radio de distancia dispuesto por esta Ley que no haya consentido dicha ubicación mediante declaración jurada.
> ........
> f) Toda torre de telecomunicaciones que esté ubicada en un distrito que no sea residencial o rural deberá mantener una distancia mínima desde la torre hasta la **estructura** más cercana de quince (15) metros. (Énfasis suplido).

Ahora bien, tanto la Exposición de Motivos de la Ley Núm. 89-2000, *supra*, como el Art. 3 (Declaración de política pública) son claros en establecer que el Art. 5 se refiere a la seguridad física del ser humano que pudiera encontrarse bajo esa estructura que llamamos "residencia". La Exposición de Motivos señala lo siguiente:

> Durante la emergencia ocurrida en el país con motivo del paso del Huracán Georges el pasado 21 de septiembre de 1998, tuvimos la experiencia en distintos lugares de Puerto Rico de torres que colapsaron debido a las fuerzas de los vientos huracanados que azotaron a nuestra isla. **Hasta el momento no ha ocurrido ninguna desgracia en la que se vean afectadas las vidas de las personas aunque el peligro siempre estará latente mientras una torre esté ubicada dentro del radio de una residencia. Esta Ley tiene como finalidad regular la construcción de las referidas torres y a la vez proteger la seguridad de nuestros ciudadanos.**[28] (Énfasis nuestro).

Por otro lado, el Art. 3 (c) de la ley señala lo siguiente:

> c) La proliferación de torres que albergan antenas en zonas urbanas o en las cercanías de residencias crea desasosiego y temor por la **seguridad y vida de dichos titulares...** (Énfasis suplido).

Es importante recalcar que aunque la Ley Núm. 89-2000, *supra*, abarca otros aspectos relacionados a la ubicación de una torre de telecomunicaciones —como por ejemplo la estética-, cuando menciona la seguridad de las propiedades se refiere a la seguridad del ciudadano que se encuentre dentro de esa residencia en el momento en

---

[28] Véase Exposición de Motivos de la Ley Núm. 89-2000, *supra*.

que pudiera colapsar una torre de telecomunicaciones. En ese contexto, el riesgo de un peligro se encuentra limitado al ámbito del ser humano que reside o pudiera encontrarse dentro de la propiedad (residencia) y no a la propiedad en sí.

Con esta visión y enfoque coincidió en su alegato la Oficina de la Procuradora General. De hecho, durante la vista oral que se celebrara en este caso, la Procuradora General, Hon. Margarita Mercado Echegaray, insistió, en síntesis, que el requisito de radio de seguridad que establece el Art. 5 de la ley se refiere a la seguridad de los residentes.

Por otro lado, al hablar de seguridad nos referimos necesariamente al riesgo de un daño que en mayor o menor grado sea real, pues nadie razonablemente busca protección de aquello que no tiene la posibilidad de producirnos un perjuicio. Es por eso que como corolario de todo lo anterior precisamos entonces contestarnos las siguientes preguntas: ¿cuánto riesgo físico en realidad constituye para un ciudadano una torre construida bajo las condiciones del caso de autos?, ¿cuán real es para el propio legislador tal riesgo?

Primeramente, notemos que el Art. 5 de la Ley Núm. 89-2000 establece que ninguna torre de comunicación pueda construirse -sin el aval de los residentes cercanos- a una distancia menor que el tamaño de la propia torre. De manera que, en realidad, la disposición de por sí inicia

estableciendo que las residencias aledañas estarán fuera del radio de caída de la torre. Pero, además, y para minimizar aún más el riesgo, el artículo en cuestión establece un margen de error de 10% adicional al tamaño de la torre. De esta forma, una torre que colapsara, por ejemplo, de forma totalmente horizontal -lo que, como veremos más adelante, no se supone ocurra- en su caída tendría que también moverse totalmente de su base para que pudiera hacer contacto con una residencia.

Sin embargo, nótese que, aún en el supuesto anterior, todavía existiría el 10% de margen de error adicional. Más aún, y como fue ampliamente argumentado durante la vista oral, estas torres de telecomunicaciones, por razón de la ingeniería y las especificaciones con las cuales están construidas, se diseñan para colapsar sobre ellas mismas hacia abajo y no a lo largo. Así ha sido determinado en múltiples jurisdicciones de los Estados Unidos.[29] En todas estas jurisdicciones los tribunales entendieron que quedó probado que las torres de telecomunicaciones están diseñadas para colapsar en pedazos sobre ellas mismas.[30] Por otro lado, en el 2000, el Tribunal de Apelaciones para el Cuarto Circuito resolvió el caso de Petersburg

---

[29] Véanse Bevivino v. Town of Mount Pleasant Bd. Of Zoning Appeals, 402 S.C. 57, 65 (2013); USCOC of New Hamphire RSA #2, Inc., v. City of Franklin, 413 F. Supp. 2d 21, 31 (2006); Group EMF, Inc. v. Coweta County, 131 F. Supp. 2d 1335, 1340 (2000); Iowa Wireless Services, L.P. v. City of Moline, Ill., 29 F. Supp. 2d 915, 921 (1998).

[30] Íd.

Cellular Partnership v. Board of Supervisors of Nottoway, 205 F.3d 688 (4$^{to}$ Cir. 2000). Una de las controversias en ese caso era precisamente la preocupación de la ciudadanía de que la torre de telecomunicaciones colapsara. En ese aspecto, el tribunal resolvió que quedó demostrado que:

> **[T]he tower was designed to collapse on itself, thus presenting no danger to no one.**[31] (Énfasis suplido).

Por otro lado, notemos que el Art. 5 no prohíbe que cualquier persona construya dentro del radio de seguridad de una torre. Esto es, una persona puede construir para él y su familia una residencia que no cumpla de forma alguna con el requisito de seguridad que establece esta disposición. De igual manera, basta con que los vecinos cuyas residencias se encuentran dentro del radio de seguridad avalen bajo declaración jurada la construcción de una torre para que entonces se pueda también obviar por completo este requisito. Lo anterior demuestra que aunque el legislador mostró preocupación por el riesgo que pudiera representar la construcción de estas torres para la seguridad física de los residentes de una comunidad, a su vez acepta que tal riesgo en realidad es mínimo. De otra manera, ¿cómo podrían entenderse tales excepciones a riesgo de la seguridad física de adultos y niños?

---

[31] Petersburg Cellular Partnership v. Board of Supervisors of Nottoway, 205 F.3d 688, 696 (4$^{to}$ Cir. 2000).

Determinado entonces que el riesgo real para los vecinos aledaños a una torre de comunicaciones -considerando la manera en que se construyen estas torres y conforme lo que claramente puede interpretarse de la ley- es uno mínimo, nos corresponde darle contenido a la palabra "residencia" del Art. 5 de la Ley Núm. 89-2000. Esto, en el contexto, además, de que esa ley es un estatuto de telecomunicaciones subordinado en sus disposiciones a la Ley de Telecomunicaciones Federal y que debe, a su vez, ser interpretado en armonía con la Ley de Telecomunicaciones de Puerto Rico, *infra.*

En primer lugar y como mencionáramos anteriormente, el servicio de telecomunicaciones es de alto interés público. Al analizar la Ley Federal y la Ley de Telecomunicaciones de Puerto Rico vemos que fomentan el acceso y disfrute de todos los ciudadanos a los servicios de telecomunicaciones. Así pues, estas leyes se crearon con el propósito de eliminar barreras reglamentarias innecesarias y simplificar los demás requerimientos reglamentarios.[32] El propósito de la desreglamentación establecida en estas leyes es asegurar la disponibilidad del más amplio número de facilidades de telecomunicaciones.

---

[32] Clases A, B y C v. PRTC, supra, pág. 675; Claro TV y Junta Regl. Tel. v. OneLink, supra, pág. 190; Caribe Comms., Inc. v. PRTC, supra, pág. 217; PRTC v. J. Reg. Tel. de P.R., supra, págs. 279-280. Véanse, además, 47 USC 253; Qwest Communications Corp. v. City of Berkeley, 146 F. Supp. 2d 1081, 1096-1097 (2001); TCG Detroit v. City of Dearborn, 206 F.3d 618 (6th Cir. 2000); AT&T Corp. v. Iowa Utilities Bd., 525 US 366 (1999); AT&T Communications of Southwest, Inc. v. City of Dallas, 8 F. Supp. 2d 582, 587 (1998).

Tanto el gobierno federal como el gobierno estatal han establecido políticas y objetivos para el desarrollo de los servicios de bandas anchas. A estos efectos, y como por ejemplo, la FCC adoptó el programa conocido como "National Broadband Plan" en el cual establece las prioridades federales de telecomunicaciones.[33] En síntesis, este programa tiene como objetivo el que se establezcan redes inalámbricas más rápidas y de mayor alcance a través de todo el País y sus territorios, proveyendo ese servicio a la mayor cantidad de viviendas y personas con acceso a conexiones de banda ancha económicas y de clase mundial.[34] Es por esto que se han permitido las instalaciones de torres de telecomunicaciones en áreas residenciales, para poder expandir la cobertura y asegurarse que todos los ciudadanos, no importa donde vivan, reciban el servicio. Para cumplir con estos objetivos, se crearon estas leyes eliminando toda barrera reglamentaria innecesaria al desarrollo de las torres de telecomunicaciones.

Considerando todo este marco referencial, nos correspondía interpretar cómo definió o, mejor aún, qué quiso incluir el legislador cuando usó el término "residencia" del Art. 5(a) de la mencionada ley, al

---

[33] The National Broadband Plan en http://www.broadband.gov/plan/ (última visita el 13 de agosto de 2013). Véase, además, Federal Communications Commission, Connect America Fund; A National Broadband Plan for Our Future; Establishing Just and Reasonable Rates for Local Exchange Carriers, 26 FCC Rcd. 4554 (2011).

[34] Íd. Véase, además, Vermont Public Service Bd v. FCC, 661 F.3d 54 (2011).

referirse al lugar protegido por el radio de seguridad. Como mencionáramos, al interpretar dicho término debíamos analizar todas las disposiciones de las leyes pertinentes armonizándolas con el objetivo de seguridad y el balance que busca salvaguardar y proteger la Ley Núm. 89-2000, *supra*. **Así las cosas, equilibrando lo dispuesto en dicha ley con las leyes de telecomunicaciones antes mencionadas e interpretando la ley como un texto íntegro, el radio de seguridad establecido en la Ley Núm. 89-2000, *supra*, busca proteger la residencia y la seguridad de los ciudadanos que se resguardan en ella durante eventos atmosféricos. Por lo tanto, resultaba forzoso determinar que el legislador se refería a la <u>estructura residencial</u> y no a la propiedad ni a estructuras accesorias, como lo son la terraza, los columpios, las estructuras de almacenamiento e invernaderos, pues estas no son estructuras en que las familias puertorriqueñas se refugian para buscar protección durante un evento atmosférico.** Conforme al contexto de la legislación y la intención del legislador, no podíamos encontrar otra posible interpretación a la palabra "residencia".

Por otro lado, establecer requerimientos mayores a los dispuestos en la Ley Núm. 89-2000, *supra*, resulta en un incumplimiento de la política pública desregulatoria antes mencionada y limita la disponibilidad de terrenos adecuados para la instalación de torres de telecomunicaciones. Al interpretar "residencia" como la

estructura residencial más toda estructura accesoria, se hace casi imposible instalar torres de telecomunicaciones en distritos residenciales. Esto tiene el efecto de afectar la habilidad de las compañías de telecomunicaciones de proveer a los ciudadanos costos más justos, razonables y asequibles. Como resultado, entiendo que la construcción e instalación de torres de telecomunicaciones se tornará más onerosa, esto en contra de los objetivos de la Ley Federal y de la Ley de Telecomunicaciones de Puerto Rico, ya que será más difícil llevar los servicios de telecomunicaciones a todos los ciudadanos.

En vista de todo lo anterior, la definición establecida por la Junta Revisora al término en controversia se ajustaba al Derecho.

## IV

Según los fundamentos expuestos, QMC cumplió con el radio de seguridad establecido en la Ley Núm. 89-2000, *supra*. La distancia del radio de seguridad se debía medir desde el centro de la ubicación de la torre hasta la residencia más cercana, entendiéndose por "residencia" la estructura principal sin aquellas accesorias como terraza, marquesina, patio, columpios, edificaciones para almacenamiento, entre otros. Por lo tanto, entiendo que la residencia de la peticionaria se encuentra fuera del radio de seguridad.

**V**

Por todo lo anterior, disiento respetuosamente del curso de acción seguido por la mayoría de este Tribunal y, en consecuencia, confirmaría la resolución de la Junta Revisora de Permisos y Uso de Terrenos.


                              Erick V. Kolthoff Caraballo
                                    Juez Asociado